## GOULD *v.* DAY.

1. The delivery of a deed conveying land will, in the absence of direct evidence of the fact, be presumed from the concurrent acts of the parties recognizing a transfer of the title. Thus, where a deed had been executed and recorded without the knowledge of the grantee, who subsequently, upon request of the grantor, conveyed the land to a third party, it was *held* that this recognition by both parties of the transfer of the title was sufficient evidence that at that time the deed had been delivered.

2. Certain lands in Michigan, sold for taxes, were, for want of other purchasers, bid in by the State. Before the sale became absolute, the owner of the property, having a complete title thereto at the time the sale was made, purchased the State bids. *Held*, 1. That a redemption of the property from the sale was practically effected by the purchase. 2. That the ownership of the State's lien and the ownership of the title to the lands being thus united in the same person, the lien was merged in the title. 3. That tax-deeds, subsequently executed to the owner by the State, were only evidence that the taxes were satisfied, the lien of the State discharged, and the estate restored from the sale : they transferred no new title to the grantee.

8. Where a question put to a witness is in itself unobjectionable, but the answer goes beyond what is called for, and is improper or incompetent testimony, an objection to the question will not extend to the answer. Special objection must be taken in such case to the answer. *So held*, where a witness was asked whether he could form a judgment of the quantity of timber which had been on certain pine-timber lands from the stumps that remained, and he stated in his answer what, in his judgment, the quantity was.

ERROR to the Circuit Court of the United States for the Eastern District of Michigan.

The action was on the case against Gould, the defendant in the court below, for selling lands, situated in the State of Michigan, under a power of attorney from the person appearing to be the owner on the public record of deeds, knowing at the time that the property belonged to the plaintiff. The declaration avers that the several parties who bought at the sales thus made were purchasers for a valuable consideration, in good faith, without notice of the rights of the plaintiff, and that the property has thus been lost to him.

The lands were originally derived from the United States, under a grant to aid in the construction of a railroad in Michigan. In April, 1865, Charles J. Anthony, of the city of New York, the then owner, conveyed them to his brother-in-law, Cyrus F. Jackson, who was ignorant of the fact that the deed had been made and recorded. In June following, Jackson, at

the request of Anthony, conveyed them to Anna D. Anthony, his wife, and, on Sept. 2, 1867, Anthony and wife conveyed them to the plaintiff, Henry Day, in settlement of a claim of the latter, amounting to $38,000. All the conveyances, except the one from Jackson to Mrs. Anthony, were, within a few months after their execution, placed on record in the proper offices of registry where the lands are situated. The one to her appears to have been mislaid; at any rate, it was not recorded until January, 1871. The plaintiff was not aware, when he took the deed to himself, of any defect in the record of the title.

Some time in the spring of 1869, about a year and a half after the plaintiff's purchase, Jackson, who claimed that Anthony, Day, and others were indebted to him for services to the amount of $781, discovered, in what way does not appear, that of the land conveyed to him by Anthony in 1865 two sections in Gratiot County were left standing in his name on the public records, and he undertook to make his claim out of these sections.

With this object in view, he wrote to a friend on the subject in Owosso, Mich., near which the lands are situated, and that friend gave the letter to a lawyer of the place, the defendant, Amos Gould, to answer. Gould accordingly wrote to Jackson, under date of May 22, 1869, stating that he himself was a large owner of railroad lands in his own right, and was prepared to trace out the title to any of them; that, if desired, he would take measures to find out all the lands to which Jackson had any title, and sell them, if an opportunity offered. A correspondence then followed between Jackson and Gould, lasting for some weeks. In that correspondence Jackson did not pretend that he in fact owned any lands in Michigan, but stated that he understood that Anthony, for whom and others he had been engaged in locating railroad lands in that State, had, in making deeds of the lands, left two sections standing on the records in his name; that he had been requested to convey these sections to the plaintiff, Day, but had refused to do so unless Day would see his claim paid. Through all his letters, the only wish expressed was to recover his claim; when that was paid, he was willing to execute any deeds desired. On the other hand, Gould, who, in looking up the title to the sections

named, had discovered that the deed of Anthony, which conveyed the sections to Jackson, also embraced several thousand acres of other lands, and that the deed of Jackson to Mrs. Anthony had not been placed on record, wrote to Jackson, that, in order to aid him and protect his interest, it would be best for him and his wife to execute a power of attorney, which he enclosed, to sell the two sections mentioned, and added, that there might be other land similarly situated in other counties, and, in order to take charge of whatever there might chance to be, he had made the power broad enough to cover it all. He at the same time advised Jackson to make no answer to any letters received from Day or others on the subject, until information of what they contained was communicated to him, and his advice taken as to the reply. The power of attorney, bearing date June 14, 1869, and authorizing Gould to sell the two sections, and all other lands of Jackson situated in the State, was accordingly executed, and returned to Gould; and he immediately proceeded to sell not only the two sections, but other large tracts. Shortly after the receipt of the instrument, he disposed of 5,642 acres for the sum of $8,495, of which 5,522 acres were sold to his son-in-law. The first sale, on June 21, was of 1,280 acres, for $1,920; the second, June 26, was of 120 acres, for $1,200; either of which produced more than sufficed to satisfy the claim of Jackson, which, as already stated, amounted only to $781, and the expenses incurred for its collection.

In a subsequent communication to Jackson, marked " confidential," made after the first sale, the fact that a sale had been made was concealed, and an opinion expressed, that in a few months the claim could be made, but of that he could not speak with certainty until he had perfected his examination ; he, however, advised Jackson to send all letters received on the subject of the lands to him, and not to answer any of them until properly instructed, and, if asked about the lands, to say that he owned them, and had bought and paid for them.

Repeated efforts were subsequently made to obtain from Gould a list of the lands sold, and a statement of the amount received ; but nothing could be heard from him beyond the fact that he had disposed of all the lands in Michigan he could

find to which Jackson appeared to have the title. He declined to give any information as to the property sold beyond this general statement, and he rendered no account of the proceeds received. When informed by Jackson of the anxiety of Anthony and Day, he wrote to Jackson, saying: "You and I should have nothing to say to Mr. Anthony or Mr. Day, except that you have sold the lands, and have no more to do with the matter. We can do ourselves no good by talking too much with the other side."

The want of success attending the efforts to ascertain the sales made, and the pressure brought by Day upon Jackson for a conveyance of the lands, led to the exposure of the correspondence with Gould, and ultimately to the institution of the present action.

A considerable portion of the lands conveyed by Anthony and wife was, in October, 1867, sold for taxes assessed in 1866, and bid in by the State. On May 9, 1868, Day, the plaintiff, bought the State bids, and on Feb. 11, 1869, the Auditor-General made quitclaim deeds of the land to him. Of these deeds there were seven; but, one of them being for land sold and conveyed in 1862, the court told the jury that the plaintiff had not shown any title to the land it covered. So this deed may be put entirely aside. There then remained six tax-deeds made by the Auditor-General to the plaintiff of his own land; and these deeds the defendant Gould offered for the purpose of showing that the plaintiff could not recover, because in June and July, 1869, he acquired title to the lands by said tax-deeds, and that hence a conveyance of them by Gould, as attorney of Jackson, to other parties could not injure him.

In other words, the position of the defendant was that the tax-deeds gave the plaintiff a new and paramount title, which extinguished all his previous titles, and that Gould's conveyance of Jackson's title of record could therefore do the plaintiff no harm.

To show the value of some of the lands sold by the defendant under the power of Jackson, a witness by the name of Alexander W. Heather was introduced upon the part of the plaintiff as an expert in the business of examining pine-timber lands, and making estimates of the quantity of timber thereon, and of

the value of such lands in the region where these were situated.
He testified that he had examined certain of the lands in question in 1861, and gave evidence tending to show that he found
that the timber had been cut off subsequently to the sale of
them by the defendant under the power of an attorney from
Jackson.   Witness was then asked this question: "From the
stumps, could you form a judgment of the timber that had been
there?"

This question was objected to by the defendant as incompetent; but the objection was overruled, and the witness answered:
"I judge from what stumps I saw that there had been about
fifteen millions of feet cut off the lands altogether."

To this ruling of the court exception was taken.

The court was requested by the defendant's counsel to charge
the jury, among other things, as follows: That if they found
that the deed from Anthony to Jackson put in evidence by the
plaintiff was made and recorded without the knowledge of Jackson, and never delivered to him, then no title to the land described therein passed to him, and the plaintiff obtained no title
thereto by virtue of his deed from Anna Anthony.

That the tax-deeds put in evidence were *prima facie* evidence
that the title to the lands therein described was in the plaintiff
at the time when the defendant, as attorney for Jackson, attempted to convey the same, and therefore, as to such lands, the
plaintiff could not recover against the defendant, as he had not
been injured by such attempted conveyance as attorney for
Jackson.

The court refused to thus charge the jury, and the defendant
excepted.   But upon the first of these requests the court instructed the jury as follows:—

That if they should find that Jackson acted upon the deed
made to him by conveying the lands afterwards to Mrs. Anthony, that then the delivery was of no consequence.   He
thereby affirmed the conveyance to himself, and neither he nor
Gould, the attorney under him, could question it.   It also charged
that his acting upon the title, by assuming to convey the same,
or rather to authorize the conveyance of the same by a power
of attorney to Gould, was a ratification of it, and the want of
delivery was of no importance in the case.   The title was as

perfect as if the delivery had been made at the commencement.

The jury found for the plaintiff, and assessed his damages at $33,020.65; and they found specially, upon certain questions of the defendant propounded to them in writing, as follows:—

"'1st, Was the deed from C. J. Anthony and wife, to Cyrus F. Jackson, ever delivered to said Jackson, or to any one for him?' They answered, 'We find no actual delivery.'

"'2d, Did said Jackson have any knowledge, previous to the execution of said deed, that it was to be executed?' They answered, 'No.'

"'3d, Did he, after its execution, in any way accept it?' They answered, 'Yes.'

"'4th, Did the defendant, when he executed the conveyance as attorney for Jackson, have any knowledge or belief that the plaintiff had any title to lands thus conveyed, or any valid claim thereto?' They answered, 'Yes.'

"'5th, Did the defendant, when he executed the conveyance as attorney for Jackson, believe that said Jackson had the legal title to the lands so conveyed?' They answered, 'No.'"

They also answered "yes" to the following question of the plaintiff:—

"'Did not the defendant, at the time he sold the lands in question, have knowledge of such facts as brought to him notice that plaintiff claimed these lands, and which, if followed in good faith, would have led him to a knowledge of plaintiff's full title.'"

Judgment being entered upon the verdict, the defendant brought the case here on writ of error.

*Mr. C. I. Walker* for the plaintiff in error.

*Mr. Henry Day* for the defendant in error.

Mr. Justice Field, after stating the case, delivered the opinion of the court.

The whole conduct of Gould, as disclosed by his letters, indicated a fraudulent purpose. It might justly be termed larcenous, if larceny could be applied to a fraudulent sale of another's lands, and the retention of the proceeds. He knew that Jackson was not the owner of the lands which were sold

in his name. The jury have found as a fact, that, when he made the conveyances, he did not believe that Jackson had any title. He was aware, therefore, all the time, that he was defrauding the true owner, whoever he might be, by the use of the power of attorney. The jury have also found that he had knowledge of facts which informed him that the plaintiff claimed the lands, and which, if followed in good faith, would have disclosed the plaintiff's full title ; and that he then knew or believed that the plaintiff had the title, or a valid claim, to the lands. From the outset, he was made acquainted with the fact that whatever title remained on the records in the name of Jackson was there by accident or mistake, and that all Jackson asked was that the property thus situated might be subjected to the payment of his claim. Learning the true condition of things, that the deed to Mrs. Anthony had never been recorded, he concealed the fact from Jackson, advised him to set up a false claim of title, obtained from him, under pretence of aiding him and protecting his interests, a power of attorney to sell any lands in the State, and then proceeded at once to dispose of not merely the two sections which Jackson had originally desired to subject to the payment of his claim, but immense tracts of other lands. After this, he refused to give any account of the sales made, and, with the exception of paying the claim of Jackson, he put all the proceeds into his own pocket, amounting to several thousand dollars. As said by counsel, fraud and guilty knowledge are written all through his letters.

Now, when called to account for his acts, he sets up as a defence, —

1st, That Jackson never acquired the title to the lands, sold under the power, by the deed from Anthony in 1865, inasmuch as he was not aware of the execution of that deed at the time, and, consequently, there was no formal delivery of it to him; and,

2d, If he did thus acquire the title, the plaintiff was not injured by the sales, because he had previously purchased the lands at tax sales, and thus obtained a superior title to the property.

If these defences could be sustained, they would only show that the defendant is not liable in this action, not because he

was guiltless of fraud, but because the fraud committed injuriously affected only other parties. His conduct would not then stand in any better light. But the defences are not tenable.

It is true that Jackson was ignorant of the fact that Anthony had made a deed of the lands to him in 1865, until he was called upon to reconvey them; but, when informed of the fact, he immediately acted upon the assumed validity and operation of the instrument, and executed the desired conveyance. Now, while it is law that a delivery of a deed is·essential to pass an estate, and there can be no delivery without a surrender of the instrument or the right to retain it, such delivery will be presumed, in the absence of direct evidence, from the concurrent acts of the parties recognizing a transfer of the title. The question here is not whether the delivery took place at the date of the deed, but whether it took place at all. The acts of the grantor and grantee — the one in asking a reconveyance and the other in making it — were satisfactory evidence that at that time the delivery had been made, and they justified the finding of the jury that the deed had been accepted by Jackson. *Jackson* v. *Cleveland*, 15 Mich. 94.

As to the tax sales, they were made in 1867 for unpaid taxes of 1866; and, for want of other purchasers, the lands were bid in by the State. The sales were made after the plaintiff had purchased the lands; but in May, 1868, before the time of redemption had expired, he bought the State bids, and in February, 1869, received quitclaim deeds from the auditor-general of the State. These deeds were produced by the defendant to show that at the time of his sales in June and July following, under the power of attorney of Jackson, the plaintiff possessed a superior title, which was not affected by those sales, and thus that the fraud which the defendant committed injured only the purchaser who trusted him, and did not injure the plaintiff. The answer to this position is obvious: the plaintiff, by his purchase of the State bids, practically redeemed the property from the tax sales, and therefore acquired no new or additional title by the tax-deeds. Whatever operation the deeds had under these circumstances, it was only as evidence that the taxes were satisfied, the lien of the State

discharged, and the estate restored from the sale.  By the law of Michigan, taxes upon real property constitute a lien upon it, which continues through all its transfers, until the taxes are paid, or the sale of the property for their payment has become absolute.  Whoever subsequently purchases the property is presumed to know of the taxes existing at the time, as they are a matter of public record; and the law informs him that he must see that they are paid, or suffer a possible loss of his estate.  Whether in the present case the plaintiff stood in any such relation to his vendor as to make it obligatory upon the latter to pay the taxes previously assessed we are not informed; nor is it material.  The State looked only to the property, and did not concern itself as to the relations between the former and present owners.  If, therefore, the plaintiff did not wish to see his interest sacrificed, his only course was to pay the taxes before the sale, or to redeem the land from the sale afterwards.  By the purchase of the bids before the sale became absolute, he practically effected a redemption.  He thus united in himself the ownership of the State's lien and the title to the lands.  This union of conflicting interests operated to merge the lesser interest in the greater, the lien in the title.  One cannot have a lien upon his own property, except where equity interposes, and, to prevent a failure of justice, keeps the lien outstanding; and here there was no interference of equity, and no occasion for its interference.  The rule of law took effect at once, and the State lien was *eo instante* merged in the plaintiff's general title.  The operation of the purchase was not unlike that which would have followed from the purchase by the plaintiff of a mortgage upon the premises executed by his vendor; the transfer of the mortgage would be equivalent in its effect to a satisfaction of the demand secured, and a release of the security.  So, here, the transfer of the bid to the owner of the property sold was in law equivalent to a payment of the taxes and a discharge of the lien.  Any subsequent deed in the one case from the mortgagee, or in the other from the State, could have no operation as conveyances of any interest to the grantee.  It is certain that the plaintiff, in buying the State bids, and subsequently taking the State deeds, never supposed that he was thereby impairing or destroying his original title.  There was

at the time no defect in that title, and there was no adverse interest claimed in the lands; and he was not aware that the conveyance to his grantors had not been recorded. *Smith* v. *Lewis*, 20 Wis. 354. The only title which a stranger could have obtained by the tax-deeds, he had already acquired by his purchase from the previous owners.

The court below, therefore, did not err in refusing the instruction asked, that the tax-deeds were *prima facie* evidence that the title to the lands embraced in them was in the plaintiff, when the defendant, as attorney for Jackson, attempted to convey the lands to others; and that, therefore, as to such lands, the plaintiff was not injured by the conveyances made. Whatever *prima facie* evidence of such title the deeds might have been by themselves, was overcome by the fact that the grantee was, at the time of the tax sales, the owner of the property, and, as such, had practically redeemed it from the sales. A tax-deed executed after redemption from the sale, or, what is in legal effect the same thing, after the lien of the tax has been transferred to the owner of the property before the sale has become absolute, confers no title.

The objection to the testimony of the witness Heather, in answer to the question whether he could form a judgment of the quantity of timber which had been on certain pine-timber lands from the stumps that remained, is untenable; for it was not taken in the court below. The question was there objected to, not the answer. The question only inquired as to the witness's ability to judge from an existing fact what a previous fact might have been, and in itself was unobjectionable. If his answer went beyond the question, it was to that the objection of counsel should have been directed, by a motion to exclude it as not responsive, or otherwise improper, or as incompetent testimony.             *Judgment affirmed.*