ABRAHAM H. SARASOHN, Appellant, v. REBECCA KAMAIKY et al., Respondents, Impleaded with Others.

1. WHAT CONSTITUTES DELIVERY OF WRITTEN INSTRUMENT. Whether certain acts, words and circumstances constitute delivery of an agreement is a question of intent. The usual method of delivering a unilateral agreement is by handing the paper to the grantee or promisee. In case of a bilateral agreement the delivery is usually evidenced by words; but it is not necessary that a delivery be evidenced in any prescribed manner, and any evidence that shows the intention of the parties that the instrument should be operative and binding is sufficient. Delivery will be presumed in the absence of direct evidence where the concurrent acts of the parties recognize the obligation thereof.

2. VALIDITY OF CONTRACT IN CONSIDERATION OF MARRIAGE. Contracts by which third persons covenant to perform certain promises in consideration of a marriage are valid. A father entered into an agreement with his son to execute a will in favor of the latter in consideration of his marriage to a woman designated as his bride-elect, and such marriage was entered into by the son, the agreement being signed by both parties and left with the scrivener; a copy certified by the father

was in possession of the son at all times after the date of the agreement, which was treated as binding by both parties, and in addition thereto the son agreed as a further consideration for the promise of the father that he would cancel a mortgage given by his mother. *Held*, in an action to enforce the agreement, that the possession of the certified copy was presumptive evidence of delivery by the father, had the same effect as if it had been an original and was a recognition by the father that the written agreement was a completed transaction.

*Sarasohn* v. *Kamaiky*, 120 App. Div. 110, reversed.

(Argued October 8, 1908; decided October 23, 1908.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered July 26, 1907, affirming a judgment in favor of defendants entered upon a dismissal of the complaint by the court on trial at Special Term.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Denis O'Brien, Edward S. Johnston* and *Abraham H. Sarasohn* for appellant.    There was no necessity for the plaintiff to prove a manual delivery of the written instrument to him; but if there was, the plaintiff has fully met any such requirement by producing from his possession the copy of the instrument countersigned by decedent.    (*Ward* v. *Hasbrouck*, 44 App. Div. 34; *Peabody* v. *Speyers*, 56 N. Y. 237; *Lewin* v. *Dietz*, 106 App. Div. 211; *Bierer* v. *Fretz*, 32 Kan. 329; *Reed* v. *Douthit*, 62 Ill. 348; *Crabtree* v. *Crabtree*, 159 Ill. 342; *Shuts* v. *Shuts*, 159 Ill. 654; *Sawyer* v. *Warner*, 15 Barb. 282; Abbott's Trial Brief, 498; *Straugh* v. *Wilder*, 119 N. Y. 530; *Hoffman* v. *Hoffman*, 6 App. Div. 34; *Halliday* v. *Case*, 64 N. Y. Supp. 825.)    Irrespective of the execution of the written instrument, plaintiff has established by undisputed testimony a parol agreement, the existence of which is proved conclusively by the written instrument and the attempted will. (*Maddox* v. *Rowe*, 23 Ga. 436; *Matter of Westcott*, 34 App. Div. 239; *Barker* v. *Bradley*, 42 N. Y. 316; Greenl. on Ev. 304, 305; *Hope* v. *Smith*, 3 J. & S. 458; *Hope* v. *Ballou*,

58 N. Y. 380 ; *Webster* v. *Zeilly,* 52 Barb. 484.)   The written
agreement sought to be enforced is not so indefinite or uncer-
tain as to make its enforcement impossible.   On the contrary,
the clause in question is definite on the face thereof and capa-
ble of exact ascertainment.   ( *Woolsey* v. *Funcke,* 121 N. Y.
87 ; *Sattler* v. *Hallock,* 160 N. Y. 291 ; *Richards* v. *Edick,*
17 Barb. 269 ; *Dodge* v. *Zimmer,* 110 N. Y. 48 ; *Fox* v.
*Coggeshall,* 95 App. Div. 410 ; *Brewer* v. *Horst-Lachmund
Co.,* 60 Pac. Rep. 418 ; *P. V. P. & B. B. Co.* v. *Baily,*
90 Pac. Rep. 803 ; *Calkins* v. *Pease,* 125 Ill. App. 270 ;
*Kroeger* v. *Good,* 89 Pac. Rep. 632 ; *Nicoll* v. *Sands,*
131 N. Y. 24 ; *Ins. Co.* v. *Dutcher,* 95 U. S. 273.)   The
agreement sought to be enforced is fair and equitable to
the widow and next of kin other than the plaintiff, and the
refusal to enforce such agreement would cause injustice and
undeserved hardship to plaintiff, no less than to his wife and
children.   ( *Winne* v. *Winne,* 166 N. Y. 263 ; *Healy* v. *Healy,*
166 N. Y. 624 ; *Parsell* v. *Stryker,* 41 N. Y. 480 ; *Lobdell* v.
*Lobdell,* 36 N. Y. 323 ; *Freeman* v. *Freeman,* 43 N. Y. 34 ;
*Bush* v. *Whitaker,* 45 Misc. Rep. 74 ; *Matter of Steglich,* 91
App. Div. 75 ; *Kine* v. *Farrell,* 71 App. Div. 219 ; *Johannes*
v. *Martian,* 22 App. Div. 561 ; *Heath* v. *Heath,* 18 Misc.
Rep. 521 ; *Gates* v. *Gates,* 34 App. Div. 608.)   The agree-
ment is supported by sufficient and adequate considerations
moving to the decedent.   (*Phalen* v. *U. S. Trust Co.,* 186
N. Y. 178 ; *Hamer* v. *Sidway,* 124 N. Y. 538 ; *Kremer* v.
*Kremer,* 90 App. Div. 176 ; *Shadwell* v. *Shadwell,* 9 C. B.
[N. S.] 159 ; *Calborne* v. *Godfrey,* 3 Desaus. 514 ; *McNutt* v.
*McNutt,* 2 L. R. A. 376 ; *Hammersley* v. *De Biel,* 12 Cl. &
Fin. 45 ; *Synge* v. *Synge,* L R. [1 Q. B. 1894] 466 ; *Sperry* v.
*Arden,* 1 Johns. Ch. 261 ; *Dygert* v. *Remerschneider,* 32
N. Y. 629 ; *Wood* v. *Jackson,* 8 Wend. 9 ; *Bornfield* v.
*Rumsey,* 4 T. & C. 322 ; *May* v. *May,* 55 Ill. App. 488.)
The written agreement of the decedent to bequeath is enforce-
able as a valid contract based on sufficient consideration con-
sisting of plaintiff's written agreement that the mortgage held
by him on property partly owned by decedent shall be

annulled and canceled. (*Kine* v. *Farrell*, 71 App. Div. 219;
*Godine* v. *Kidd*, 64 Hun, 585; *Yarwood* v. *T. G. & T. Co.*,
94 App. Div. 47; *Velie* v. *Titus*, 60 Hun, 405; *Bush* v.
*Whitaker*, 34 Misc. Rep. 74; *North* v. *Case*, 42 N. Y. 362;
*Earl* v. *Peck*, 64 N. Y. 596; *Hamer* v. *Sidway*, 124 N. Y.
538; *Dovale* v. *Ackerman*, 2 App. Div. 404; *Cowen* v.
*Rouss*, 40 Misc. Rep. 105; *Struthers* v. *Smith*, 85 Hun,
261.)

*Nathan Bijur* and *George H. Engelhard* for respondents.
The refusal to find that the father made a binding agreement
in writing, as well as the finding to the contrary, were sup-
ported by evidence. (*Potter* v. *Carpenter*, 71 N. Y. 74;
*Stevens* v. *Mayor, etc.*, 84 N. Y. 296; *Andrews* v. *Raymond*,
58 N. Y. 676; *Sherman* v. *Foster*, 158 N. Y. 587; *Dietz* v.
*Farish*, 12 J. & S. 190.) There is positive evidence to sup-
port the finding that the father did not intend the instru-
ment signed by him to become binding unconditionally.
(*Dietz* v. *Farish*, 79 N. Y. 520; *Souverbye* v. *Arden*, 1 Johns.
Ch. 250; *Scrugham* v. *Wood*, 15 Wend. 545; *McLean* v.
*Button*, 19 Barb. 450.) There is no presumption that the
rabbi's possession of the instrument was for the unqualified
benefit of the appellant. (*Reed* v. *Douthead*, 62 Ill. 348; *Crab-
tree* v. *Crabtree*, 59 Ill. 342; *Shults* v. *Shults*, 159 Ill. 654.)
The finding that the meaning of the third clause of the instru-
ment cannot be ascertained is supported by evidence. As
there is a latent ambiguity in that clause, that finding is
properly classed as a finding of fact. (*Petrie* v. *Trustees*,
158 N. Y. 458; *Kenyon* v. *K. T. & M. M. A. Assn.*, 122 N. Y.
247; *Sherman* v. *Foster*, 158 N. Y. 587; *Brown* v. *Quin-
tard*, 177 N. Y. 75.) There is evidence to sustain the fif-
teenth finding of fact that there was no consideration for the
agreement. The consideration alleged in the complaint was
not proved. (*Kline* v. *Farrell*, 71 App. Div. 219.) Treat-
ing the father's alleged agreement as a unilateral one the mar-
riage of the appellant was not as a matter of fact a considera-
tion therefor. The finding of fact that there was no consid-

eration for the father's promise is, therefore, in this aspect also supported by evidence. (Schouler on Dom. Rel. § 180.) As a matter of law the plaintiff's marriage could not be a consideration for the father's promise, because, when the latter was made, the appellant was already under a legal duty to marry. There is no reason to exempt contracts like the one sued upon from the ordinary rule of contracts in this respect. (*Seybolt* v. *N. Y., L. E. & W. R. R. Co.*, 95 N. Y. 562; *Arend* v. *Smith*, 151 N. Y. 502.) There is evidence to support the finding that the agreement was unfair to the widow and other next of kin. (26 Am. & Eng. Ency. of Law, 67.)

CHASE, J.  This action is brought to enforce specifically an alleged agreement signed by the plaintiff and Kasryel H. Sarasohn, his father, February 9, 1904.  Kasryel came to this country in 1874 and commenced the publication of a paper known as the *Jewish Gazette*.  He had a wife, the defendant Bertha, and two sons, the defendant Ezekiel and the plaintiff, and one daughter, now deceased, the mother of the defendants Rebecca, Israel and David Kamaiky.  In 1876 Ezekiel, then about ten years of age, came to this country, and thereafter assisted in the business of publishing and distributing said paper.  In 1877 the plaintiff, then about six years of age, came to this country, and within a few years thereafter commenced working in connection with said business.  In 1884 Kasryel commenced the publication of the *Jewish Daily News*.  Both Ezekiel and Abraham, except during such time as they were in school, were engaged in distributing papers, setting type, and soliciting advertisements and other business for their father until 1889.  The plaintiff Abraham spent more time than his brother in school and graduated from the law department of the University of the City of New York, and in 1889 was admitted to the bar and thereafter devoted his time to the practice of his profession.  In 1889 Kasryel's daughter married one Kamaiky.  She died in 1900 leaving the defendants Kamaiky her children.  About the time the

plaintiff was admitted to the bar Kasryel's said son-in-law was employed in the business of publishing said papers and thereafter Kamaiky and Ezekiel had principal charge of such business.    At some time after 1889 the name of Sarasohn & Sons was used in such publishing business and on the 22nd day of January, 1900, articles of copartnership between Kasryel, his son Ezekiel, and his son-in-law Kamaiky were prepared by the plaintiff representing them, and duly executed, by which each of the three partners was recognized as the owner of one-third of the property and business conducted in the name of Sarasohn & Sons, and the partnership business continued under such written articles of copartnership until after the death of Kasryel, which occurred January 12, 1905.

Prior to November, 1903, Kasryel expressed a desire that the plaintiff, who was then about thirty-four years of age, should marry.    Both Kasryel and the plaintiff asked a cousin of Kasryel's wife and the mother of one Isabelle to allow Isabelle to marry the plaintiff.    Before the engagement between plaintiff and Isabelle, Kasryel told one of his old employees that " Abraham would be engaged pretty soon." Subsequently the employee said to Kasryel " Do you know Hymen (the plaintiff Abraham) is saying all the time he cannot make enough out of his professional life and he would like to have a share or interest in the *Jewish Daily News* and the *Jewish Gazette*," and Kasryel said to him, " You go to him and tell him that I will give to one child Ezekiel one share, and my part will not be given to anybody and I will not give that to any one except I give it to him."    A few days later Kasryel said to the same person : " The time is getting short and he would like to see him (Abraham) married. *   *   *   Go to tell him that I will give him a contract that my part of the ' *Jewish Daily News* ' will belong to him after I will die."    This witness repeated the conversation to the plaintiff and then returned to Kasryel and said : " He is not in a position to get married now because he does not make enough from his practice, except that you do just as you promised me as you told Abraham that you will give him

your share in the ' *Jewish Daily News* ' and the ' *Jewish Gazette.* ' "    And he, Kasryel, said : " Go to tell him that I do not like to make any wills while I am alive and I don't want to go to any lawyers — he used to be afraid all the time death in making a will — and he told me : ' Go tell Abraham I will make him a Jewish writing. A Jewish writing that the third part of my business, of my share, I will give to him after I will die.' "    This conversation was repeated to plaintiff.    On November 22, 1903, a formal Hebrew engagement ceremony was had between the plaintiff and Isabelle, although plaintiff testifies that the engagement was conditional upon the contract of the father being consummated.

An uncle of Isabelle had a conversation with Kasryel which he says was before the engagement, in which Kasryel promised to give Abraham his part in the business because that Abraham should get married to that young lady, and he further stated that he required Abraham to marry that girl.    This witness about six weeks or two months later and after the engagement had a conversation with Kasryel, in which Kasryel said, " Why he did not send out the invitations for the wedding," and the witness replied, " Unless he put everything in writing the marriage will not take place."    About two weeks later he met him again and Kasryel said, " That he had put in writing whatever he had promised."    A short time before the writing was made Kasryel sent for the mother of Isabelle and said to her : " When would a date be set for the marriage," and the mother replied, " I could not tell him because his father promised before he would give him a quarter interest in his business to his son, meaning Mr. Sarasohn, and Kasryel said, ' You tell my son in my name I give him a quarter interest in my newspaper business and he set the date for the marriage.'    And he said within a few days he would write the papers out and would fulfil all his promises, one quarter interest in the newspaper business."    After the date of the agreement signed by Kasryel and the plaintiff the date was set for the wedding, which occurred March 7, 1904.

The alleged agreement was written in Hebrew, signed by

Kasryel and by the plaintiff and witnessed by the scrivener. The following is a translation of said agreement:

" MEMORIAL WORDS CONCLUDED BETWEEN RABBI K. H. SARASOHN AND HIS SON CHAIM (HYMAN).

" 1. Rev. K. H. Sarasohn obligates himself to give his son above mentioned after his wedding, which will take place shortly with his bride-elect, the sum of one hundred dollars each and every month besides suitable apartments and offices in his house No. 187 East Broadway, without charge. This obligation shall continue as long as the above named Hyman has not a share in the business of publishing newspapers of the said Rev. K. H. Sarasohn.

" 2. In the coming spring the said Rev. K. H. Sarasohn will go to Europe; the entire period which he shall remain in Europe his said son shall stand in the place of his father to give (or express) his opinion in the said business of publishing newspapers above mentioned but in all matters relating to politics and socialism he shall not have any say.

" 3. The Rev. K. H. Sarasohn obligates himself to make a will, as is required, that after the passing away of the days and years there shall be to the said son Hyman above mentioned, twenty-five per cent of the said business of printing newspapers; this share is only to Hyman personally or to his descendants; but if God forbid, it shall happen that said Hyman shall have no children surviving him, his wife shall not inherit, only the other heirs of the said Rabbi K. H. Sarasohn. And the house 185 East Broadway there shall be to him one-fourth part.

" 4. If after the passing away of the days of the Rev. K. H. Sarasohn there will not be left of him what to satisfy the three grandchildren of my daughter Rebecca of blessed memory, then it is the obligation of the said Hyman to satisfy each with the sum of $2,000 or to give them five per cent of the said business of publishing newspapers.

" 5. All the mortgage that the said Hyman holds on the mother shall be at once void (or shall be canceled).

" All this is concluded in the presence of the undersigned.

" We the undersigned have accepted all the foregoing with our good will, with a perfect understanding and with a full and settled mind.

" Witness:

>          " HYMAN JACOB WIDREWITZ,
>                    " Of Moscow.

" We have come to this signature the twenty-third day of the month of Schebat, 5664, here in New York.

>          " (Signed.)          The words,
>                    " KASRYEL H. SARASOHN.
>          " (Signed.)          The words,
>                    " ABRAHAM HYMAN SARASOHN."

The trial court found among other things as follows:

" 6. That said paper writing was written by one Widrewitz, a Hebrew Rabbi, and was thereafter, and remained in his possession, until after the decease of the said Kasryel H. Sarasohn.

" 8. That on the trial of this action the plaintiff produced a copy of said paper writing and of the signatures thereto subscribed; that there were added to said copy after the copy of said signatures the words, ' Copied from the body of the writing which lies in my hand, letter for letter; ' and that the paper containing said copy and said additional words bore at the foot thereof the original signature of the said Kasryel H. Sarasohn and the words: ' Chief Rabbi of America Hyman Jacob Widrewitz from Moscow ' imprinted from a rubber stamp.

" 9. That the paper described in the foregoing 8th Finding, with the original signature of said Kasryel H. Sarasohn thereon inscribed as described in the foregoing 8th Finding, was at all times after the date of the said paper writing down to the date of the trial of this action in the possession of the plaintiff.

" 26. That the said Kasryel H. Sarasohn in his lifetime and after the marriage of the plaintiff, paid to the said plaintiff the sum of $100 a month in each and every month and furnished the said plaintiff without charge therefor, suitable apartments and office in the premises No. 187 East Broadway.

"29. That the agreement of Kasryel H. Sarasohn alleged in the complaint is an agreement in consideration of marriage but not one of mutual promises to marry.

"34. That Bertha Sarasohn, the widow of said decedent, is satisfied with the contract so made between the said plaintiff and the said Kasryel H. Sarasohn and is desirous of having the same in all respects carried out."

A few days before the death of said Kasryel he signed a paper purporting to be his will. Such paper was offered for probate in the Surrogate's Court by the plaintiff to which objections were filed by said Ezekiel and probate was refused on the ground that the decedent did not subscribe said paper in the presence of one of the persons who signed the same as a witness and did not acknowledge the signature in his presence or declare the paper to be his last will and testament.

The respondents defend this action on substantially three grounds :

1. That said agreement was never delivered.

2. That there was no consideration therefor.

3. That it is too uncertain and indefinite in its terms to be enforced specifically.

The court dismissed the plaintiffs' complaint and further found among other things the following :

"5. That said Kasryel H. Sarasohn did not intend that said paper writing thus subscribed by him should be effective as his agreement.

"12. That the language of the third and fourth clauses of the paper writing referred to in the foregoing 4th finding is so indefinite and uncertain that their meaning cannot be ascertained.

"13. That Kasryel H. Sarasohn did not make with the plaintiff any of the agreements alleged in the complaint to have been made by him.

"14. That the plaintiff did not make with Kasryel H. Sarasohn any of the agreements alleged in the complaint to have been made by him.

"15. That there was no consideration for any of the promises of said Kasryel H. Sarasohn alleged in the complaint.

"17. That the plaintiff did not marry according to the desires of said Kasryel H. Sarasohn.

"33. That the agreement of said Kasryel H. Sarasohn alleged in the complaint to wit, that he would make and execute in accordance with the statutes of the state of New York, in such case made and provided, his last will and testament wherein and whereby he would give, devise and bequeath to the said plaintiff twenty-five per cent of the business of printing newspapers founded by the said Kasryel H. Sarasohn and an equal one fourth part of the house known as Number 185 East Broadway, in the Borough of Manhattan, City of New York, is unjust, unfair and inequitable to said widow and to said next of kin of said Kasryel H. Sarasohn other than the plaintiff."

The conclusions of law are to the effect that Kasryel H. Sarasohn was not under any obligation to the plaintiff to make and execute a will giving to him twenty-five per cent or any other share of said business of printing newspapers, that there was no consideration for said alleged promises and that the alleged agreement is not such an agreement as entitles the plaintiff to a decree for specific performance of its terms.

All questions relating to a transfer of a one-fourth part of the property known as No. 185 East Broadway are eliminated from this controversy by stipulation.

At some time in 1893, or thereafter, the property at 185 East Broadway was owned by Kasryel's daughter, and in 1898 she gave to her mother a mortgage thereon of $6,000. Plaintiff's mother testified that she did not pay any money for the mortgage and further says, "Why should I give him money, the house was mine, it was my house and my husband's." Soon after the mortgage was given to her she transferred it to the plaintiff by assignment.

On April 4, 1903, the plaintiff prepared and his mother signed a paper satisfying said mortgage which he held for use

in place of the assignment if he desired to use it. He testified that after the alleged agreement was signed he was at all times ready to satisfy the mortgage. A few days after Kasryel's death his son-in-law Kamaiky asked the plaintiff for the paper satisfying the mortgage and the plaintiff delivered it to him and it was duly recorded and the mortgage satisfied.

In considering whether the essential findings of fact and conclusions of law are sustained, it is necessary for us to review briefly the principles of law that are applicable in connection with certain important undisputed facts.

Whether certain acts, words and circumstances constitute a delivery of an agreement is a question of intent. The usual way of delivering a unilateral agreement is by physically handing the paper upon which it is written to the grantee or promisee. In case of a bilateral agreement the delivery is usually evidenced by words. It is not necessary that a delivery be evidenced in any particular or prescribed manner. Any evidence that shows that the parties to a written instrument intend that the same should be operative and binding upon them is sufficient in an action to enforce its provisions.

Where two or more persons make mutual promises and, desiring to put the same in writing, go to a scrivener for that purpose, and a writing is prepared and actually signed by the parties thereto and left with the scrivener, such fact, even if not of itself presumptive evidence of a delivery, is an important fact in connection with the subsequent acts of the parties and the surrounding circumstances for the purpose of determining the intention of the parties in so leaving the signed paper with the scrivener.

The alleged agreement under consideration was signed by the plaintiff and his father, and so far formally executed in the presence of a witness who signed the paper in attestation of such fact. When so signed, each party was interested therein. Each was by the terms thereof to receive some benefit therefrom. Neither was entitled to the possession of the paper to the exclusion of the other. Every lawyer accus-

tomed to prepare agreements containing mutual promises has been called upon to hold such agreements for the mutual benefit of the parties.

In the agreement now considered is the following language: "We, the undersigned, have accepted all the foregoing with our good will, with a perfect understanding and with a full and settled mind." It is true that if the agreement was left with the scrivener subject to the performance of some condition, the statement just quoted would be as ineffective as all the other provisions thereof; but in view of the undisputed surroundings, this statement in the agreement adds to the presumption that a delivery was intended.

It appears from the ninth finding of fact that we have quoted that there came into the possession of the plaintiff on the day of the date of the agreement a copy certified not only by the rabbi who acted as the scrivener, but by the plaintiff's father as being a copy of the paper, letter for letter, then remaining in the possession of the scrivener.

The court has found that the copy of said agreement so certified by plaintiff's father was at all times after the date of the alleged agreement in the possession of the plaintiff.

If such a copy so prepared by the scrivener had not been certified by the father, it would have been of little value as evidence of the intention of the father to be bound by the terms of the original. The possession of the copy so certified is presumptive evidence that the copy was given to the plaintiff by his father.

When a document of title or obligation is made in counterpart each counterpart is usually to be regarded as an original. (1 Greenleaf on Evidence [16th ed.], sec. 563p.)

The delivery of a copy of a paper certified as a copy remaining in the possession of the scrivener is as solemn a recogition of the binding force of the original as against the person so delivering such certified copy as if the same had been a counterpart. The father thus recognized that the written agreement so left with the scrivener was a completed transaction. Both of the parties to the agreement treated it

as a binding contract.    It appears from the twenty-sixth find-
ing of fact that we have quoted that the father carried out
the terms of the agreement so far as it relates to the payment
of a monthly sum to the plaintiff after his marriage and in
furnishing him with suitable apartments and offices in the
premises No. 187 East Broadway.

It further appears, as we have already stated, that he there-
after executed a will.    Although it does not satisfy accurately
the provisions of said contract, yet in its principal features it
is corroborative of the plaintiff's claim relating thereto.    It
cannot be assumed that the irregularity in the execution of
the will was intentional; it should rather be considered as an
effort in good faith by the decedent to carry out his wishes
and obligations relative to his property.

The evidence is uncontradicted that the plaintiff married in
accordance with the wishes of his father.    The mortgage
referred to in the agreement, although not satisfied until after
the father's death, was actually satisfied at respondent's request
before probate of the will had been refused.

A delivery of an instrument will be presumed in the
absence of direct evidence where the concurrent acts of the
parties recognize the obligation thereof.    (*Goulde* v. *Day,* 94
U. S. 405.)    The record does not sustain the fifth, thirteenth,
fourteenth and seventeenth findings of fact.

Contracts by which third persons covenant to perform cer-
tain promises in consideration of a marriage are frequently
upheld.    (*Phalen* v. *U. S. Trust Co.,* 186 N. Y. 178;
*Johnston* v. *Spicer,* 107 N. Y. 185.)

The decedent's promises were made in writing and in part
at least were the result of plaintiff's reciprocal promise to
marry that antedated the formal Hebrew ceremony of Novem-
ber 22, 1903, and the interesting question as to the validity of
an agreement based upon a promise to marry made after and
entirely independent of a prior promise to marry as between
the parties, is not now necessarily before us.

An agreement to marry entered into by the plaintiff with
Isabelle at Kasryel's request, accompanied by a promise to

consummate the same by marriage thereafter upon Kasryel's executing a written agreement as so promised, was a valuable consideration for the execution of such an agreement. Plaintiff testified that the marriage took place in reliance upon the agreement. The agreement postponed at least in part the consummation of the gift to the plaintiff to a time "After his wedding" and the agreement distinctly recognizes plaintiff's engagement and prior promise and refers to the wedding "Which will take place shortly with his bride elect." The promise in the agreement that the mortgage therein referred to shall be void or canceled also constitutes a valuable consideration for the agreement. It is a valuable consideration whether such mortgage was a recognized indebtedness and lien on the property in said mortgage described or a disputed claim constituting an outstanding cloud on the title to such real property.

The record does not sustain the fifteenth finding of fact. We think the agreement is not too uncertain, indefinite and unfair to permit of specific performance by direction of the court. The agreement and the provisions thereof were known to Kasryel's wife in his lifetime and it has her approval now. Her interest in the estate is the one most seriously affected by sustaining the plaintiff's contention. It has not been suggested that Kasryel was either infirm or incompetent at the time when he signed the agreement. A competent testator not under undue influence but upon friendly relation with his wife and children should know what is best and equitable in a division of his property among those entitled to his bounty.

It does not seem to be disputed that Kasryel gave to Ezekiel and to his son-in-law each a third interest in the publishing business at some time prior to 1900. The financial relation of Kasryel to the several members of his family has not sufficiently shown that the agreement was unfair. We think there is no difficulty about construing the contract or its specific enforcement. The promise in the third paragraph of the agreement is to give to the plaintiff, by will, "twenty-

five per cent of the said business of printing newspapers."
It refers to a per cent "of the business of printing papers"
and not to a percentage of any particular share thereof. The
same is true of the house at 185 East Broadway. There is
nothing in the contract to show that the decedent intended
thereby to give the plaintiff any part of the capital stock of the
Jewish Press Publishing Co. So far as appears the decedent's
only interest therein was as a stockholder.

The fourth paragraph of the agreement places upon the
plaintiff an obligation to pay each of the children of the
deceased daughter Rebecca $2,000, or five per cent of the
business of publishing newspapers in case there is not left of
his estate, after carrying out the terms of the contract with
the plaintiff, a sufficient amount to pay each of them as next
of kin such $2,000 therefrom. The record, therefore, does
not sustain the twelfth and thirty-third findings of fact.

The judgment should be reversed and a new trial granted,
with costs to abide the event.

CULLEN, Ch. J., EDWARD T. BARTLETT, HAIGHT, VANN,
WERNER and WILLARD BARTLETT, JJ., concur.

Judgment reversed, etc.