TEXAS RICE LAND CO. v. LANGHAM.
(No. 114.)

(Court of Civil Appeals of Texas. Beaumont.
Feb. 15, 1917. Rehearing Denied
March 17, 1917.)

1. FRAUDULENT CONVEYANCES ⨂═295(1) — EVIDENCE OF FRAUD—SUFFICIENCY.
Evidence *held* insufficient to show that a conveyance was taken in the name of a stockholder, and not the corporation, for the purpose and with the intent of delaying, hindering, and defrauding the corporation creditors.
[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 867–869, 872, 873.]

2. FRAUDULENT CONVEYANCES ⨂═172(1) — RIGHT TO AVOID CONVEYANCE.
Since the statute as to fraudulent conveyances makes them subject to be avoided by a creditor only, a conveyance, even if made in fraud of creditors, is valid between the parties.
[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 523–526, 542.]

3. RECEIVERS ⨂═87—RIGHT TO RECOVER LAND —EVIDENCE—SUFFICIENCY.
Where corporation receiver proved that a stockholder took title in his own name for the benefit of the corporation, which paid the consideration, he was entitled to recover the land in an action of trespass to try title.
[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 161.]

4. TRUSTS ⨂═22—DEEDS IN TRUST—EFFECT.
Where heirs of a deceased stockholder in a corporation who before his death had taken title to land in his own name in trust for the corporation made their deed to individuals in trust for the corporation, and delivered it to one of the trustees, or to another for him, they divested themselves of title.
[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 31, 32.]

5. TRUSTS ⨂═160(1)—FAILURE OF TRUSTEE— EFFECT.
A court of equity will not permit a trust to lapse by nonacceptance by or nondelivery to a trustee named.
[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 207.]

6. TRUSTS ⨂═89(2)—CREATION — EVIDENCE — SUFFICIENCY.
Evidence *held* to show that, when a stockholder took title to land in himself, he did so as trustee for the corporation which paid the consideration.
[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 135.]

7. JUDGMENT ⨂═779(2)—TITLE OF DEFENDANT — DEFAULT JUDGMENT — NOTICE OF OTHER CLAIMS.
Where a stockholder took title to land in his own name, as trustee for the corporation, and on his death his heirs passed the title by their deed to the corporation, a corporation creditor which obtained a default judgment against the heirs after such deed had been given acquired no title through its default judgment.
[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1342.]

8. DEPOSITIONS ⨂═100—TIME OF TAKING—AD-MISSIBILITY IN OTHER ACTIONS.
Under Vernon's Sayles' Ann. Civ. St. 1914, art. 3653, as to taking depositions, a deposition taken in another action after filing the petition in the instant action is not admissible, but can be used only in actions filed after it was taken.
[Ed. Note.—For other cases, see Depositions, Cent. Dig. §§ 297, 298.]

Appeal from District Court, Jefferson County; W. H. Davidson, Judge.

Action by Thomas H. Langham, receiver of the McFaddin-Wiess-Kyle Land Company, against the Texas Rice Land Company. Judgment for plaintiff, and defendant appeals. Affirmed.

E. E. Easterling, Crook, Lord, Lawhorn & Ney, and Hightower, Orgain & Butler, all of Beaumont, for appellant. Smith, Crawford & Sonfield and Oliver J. Todd, all of Beaumont, for appellee.

---

⨂═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

BROOKE, J. Thomas H. Langham, receiver of McFaddin-Wiess-Kyle Land Company, appellee, on the 9th day of February, 1915, filed this suit as an action of trespass to try title against the Texas Rice Land Company, appellant. On the 4th day of October, 1915, appellee filed his amended petition as an action of trespass to try title, seeking to recover all of the David A. Cunningham survey except the portion conveyed to W. P. H. Mc-Faddin by Chaison and Hebert and a small portion used as a right of way by the Texas & New Orleans Railway Company, and, in addition to the ordinary form of such action, set up title by the several statutes of limitation, and sought to recover damages for rent, and, in the alternative, prayed to recover an undivided one-half interest in all the Cunningham survey, except said portions above referred to. The defendant, Texas Rice Land Company, after pleading a general and several special exceptions, pleaded a general denial and not guilty.

It appears that the land in controversy was owned by J. B. Hyde and Paul J. Gleisis, of New Orleans, and that, while Texas was an independent republic, the federal court at New Orleans in bankruptcy attempted to convey the title of said Hyde and Gleisis as bankrupts into Theophilus R. Hyde. Jef Chaison and J. M. Hebert acquired title from the estate of Theophilus R. Hyde and sold to W. P. H. McFaddin 245 or 250 acres awarded the plaintiff, and which is not in controversy. The heirs of J. B. Hyde, one of the bankrupts filed suit in the Circuit Court of the United States at Beaumont for the recovery of one-half interest of the bankrupt, J. B. Hyde, against the Chaisons, as well as against W. P. H. McFaddin, and recovered the property under a decree of the United States Circuit Court of Appeals at New Orleans. This judgment became final, vesting the title in said heirs. It seems to be admitted that these Hyde heirs were on October 26, 1907, at the date of their conveyance to V. Wiess, the owners of an undivided one-half interest in the land in controversy, and on the said 26th day of October, 1907, the foregoing heirs conveyed the land in controversy to V. Wiess by deed. Wiess, after acquiring the title, intervened in another suit pending between the Gleisis heirs and the Chaisons and W. P. H. McFaddin in the district court of Jefferson county, Tex., and recovered a second judgment against all of said parties for the interest recovered by the plaintiff. Therefore it appears from the record that it has been twice adjudicated that the appellant and its predecessors in title were not the owners of the land in controversy. It seems from the record that the claim of the appellant, Texas Rice Land Company, to the undivided interest acquired by V. Wiess from the J. B. Hyde heirs rests upon a judgment taken by default against the heirs of V. Wiess by appellant, taken subsequent to a time that said heirs had previously attempted to convey the land to Mc-Faddin-Wiess-Kyle Land Company, upon which said land it is claimed V. Wiess held in trust for the appellee.

The question therefore is as to the title, whether or not plaintiff showed title to the undivided one-half interest, with reference whether or not V. Wiess ever owned, held, or claimed any individual title, or whether the original conveyance to him was made in trust for McFaddin-Wiess-Kyle Land Company.

W. M. Coleman testified:

"I am bookkeeper for P. H. Wiess. I never was bookkeeper for V. Wiess. I was in his employ in a way, in the firm of V. Wiess & Son. I have been with them five years. I suppose I am the custodian of the books of P. H. Wiess and V. Wiess & Son and V. Wiess. I have brought up the books representing the transactions of V. Wiess during the year 1907. I have the journal and the cash book. On October 31, 1907, there was a charge made by V. Wiess against the McFaddin-Wiess-Kyle Land Company. It reads, 'McFaddin, Wiess & Kyle Land Co. to Hyde land purchase'—a debit of $8,000, and credits 'land purchase' with $8,000, with a notation, 'For 400 acres land in the D. Cunningham survey, Jefferson County, Texas.' Mr. Wiess charged the McFaddin-Wiess-Kyle Land Company with $8,000 on October 31st, being the purchase price advanced by him for those 400 acres of the Cunningham survey. As to whether there was any credit from the Mc-Faddin-Wiess-Kyle Land Company to apply on that indebtedness about that time, there was a check made October 31, 1907, No. 6720, on the First National Bank, in favor of R. A. Greer for $2,666.67. That was the same date as this entry. Here is a receipt shown on October 31st from McFaddin-Wiess-Kyle Land Company account of Hyde land purchase, $2,666.67. That represents the same amount he paid out on that same day, reimbursed to him by the land company. The ledger account shows a cash credit on October 31st to McFaddin-Wiess-Kyle Land Company $2,666.67. That is all it shows there, cash. The ledger indicates the payment of the two notes representing the $5,300 balance; not that the notes were paid by the land company. The account is credited with two notes, and that balances the account. There is a charge of $8,000 against him. That represents the cash and the notes. Then he credited him with cash and credited with notes, balancing the account."

B. A. Steinhagen testified:

"I have been connected with the McFaddin-Wiess-Kyle Land Company. I was stenographer, and kept books, and kept cash and was general utility man. When you ask me if I remember anything about a transaction with reference to the purchase of the Hyde interest in the D. A. Cunningham survey, I looked at some canceled checks the other day, and I recalled having made those checks. They were in my handwriting, and I made them at the instance of Mr. V. Wiess. That check was drawn by me, and also the voucher for $2,666.67 signed by Mr. Wiess. I am acquainted with his signature. That is his signature on both instruments. I drew that instrument on the instruction of Mr. V. Wiess. He mentioned at the time that it was to pay for some land that the company bought that was being taken in his name for the company."

The following check was identified by the witness as being in words and figures as follows:

"Beaumont, Texas, Oct. 31, 1907. No. 3111. The First National Bank of Beaumont, United States Depositary: Pay to the order of V.

Wiess $2,666.67, twenty-six hundred sixty-six and 67/100 dollars. McFaddin-Wiess-Kyle Land Co., by V. Wiess, V. President."

The check bears a rubber stamp on its face as follows:

"First National Bank, Beaumont, Texas. Paid Oct. 31, 1907."

The check is indorsed on the back as follows:

"Pay to the order of First National Bank, Beaumont, Texas. V. Wiess, per V. X. Wiess."

Counsel for plaintiff also offered in evidence the voucher or receipt of V. Wiess, identified by the witness, as follows:

"McFaddin-Wiess-Kyle Land Co.,
Beaumont, Texas.
"To V. Wiess, Address, City:
Oct. 31. Cash pd. by you on purchase Hyde interest in Cunningham survey as per deed to you of date for $8,000. ⅓ cash, to wit.............. $2,666.67
"Received ——, 190—, of McFaddin-Wiess-Kyle Land Co. —— dollars in full for the above account.                    V. Wiess."

The voucher being further indorsed on the back as follows:

"Cash Voucher No. 570. Date paid 10—31—1907. $2,666.67. McFaddin Wiess & Kyle Land Co. in Account with V. Wiess. Distribution. Real estate, $2,666.67."

The witness further testified:

"There were two notes given for the purchase price of this property. The notes were paid by checks of the McFaddin-Wiess-Kyle Land Company on their due dates, April 25, 1908, and May 26, 1908. I have in my hand the two notes and the two checks attached to them, which are the checks by which the notes were taken up and paid. The notes cover the balance of the purchase price of this land, and were paid directly by the company out of the funds of the McFaddin-Wiess-Kyle Land Company."

The vendor's lien notes and checks by which they were paid were identified by the witness, as follows:

"$2,666.67. No. One.
"Beaumont, Texas, Octo. 26, 1907.
"Six months after date I promise to pay to Wm. Beverly Winslow or order the sum of two thousand six hundred and sixty-six and 67/100 dollars with interest thereon from date until paid at the rate of 6 per cent. per annum, the interest payable as it accrues, both principal and interest payable at Beaumont, Texas, for value received.

"This note is given in part payment for a certain lot or parcel of land situated in Jefferson county, Texas, being about four hundred acres undivided interest in the D. Cunningham survey recovered by Lawrence Hyde et al. from W. P. H. McFaddin and others in the Circuit Court of the United States at Beaumont, Texas, the same land this day conveyed to Valentine Wiess, by Lawrence Hyde, Wm. Beverly Winslow and others, which instrument of conveyance is hereby referred to for further description and to secure the payment hereof according to the tenor hereof, a vendor's lien is retained in this note and in said conveyance. This note and all past-due interest on this note shall bear interest from the maturity thereof until paid at the rate of 6 per cent. per annum. And I hereby specially agree that if this note is placed in the hands of an attorney for collection, or if collected by legal proceedings to pay 10 per cent. additional on the principal and interest due hereon, as collection fees.                    Valentine Wiess.

| Consideration. | | When Due. |
| --- | --- | --- |
| Cash .............. | $2,666 67 | |
| Note No. 1......... | 2,666 67 | Ap. 26, 1908. |
| Note No. 2......... | 2,666 66 | "  "  " |
| Total .......... | $8,000 00" | |

Indorsed:
"Pay to the order of James S. Jackson
                    "Wm. Beverly Winslow.
"Jas. S. Jackson."

"Beaumont, Texas, Apr. 24, 1908. No. 3340.
"The First National Bank of Beaumont, United States Depositary: Pay to the order of Park Bank & Trust Co. $2,746.67, twenty-seven hundred forty-six and 67/100 dollars. McFaddin-Wiess-Kyle Land Co., by P. H. Wiess, Secretary-Treasurer."

Indorsed:
"Park Bank & Trust Co., Apr. 25, 1908, Clearing First National Bank, Beaumont, Texas. Paid Apr. 25, 1908, Clearing."

"$2,666.66 No. Two.
"Beaumont, Texas, October 26th, 1907.
"Six months after date I promise to pay to Lawrence Hyde and Katherine B. Hyde or order the sum of two thousand six hundred and sixty-six and 66/100 dollars, with interest thereon from date until paid at the rate of 6 per cent. per annum, the interest payable as it accrues, both principal and interest payable at Beaumont, Texas, for value received.

"This note is given in part payment for a certain lot or parcel of land situated in Jefferson county, Texas, being about four hundred acres undivided interest in the D. Cunningham survey recovered by Lawrence Hyde and others from W. P. H. McFaddin and others in the Circuit Court of the United States at Beaumont, Texas, the same land this day conveyed to Valentine Wiess by Lawrence Hyde, Wm. Beverly Winslow, and others, which instrument of conveyance is hereby referred to for further description, and to secure the payment hereof according to the tenor hereof a vendor's lien is retained in this note and in said conveyance. This note and all past interest on this note shall bear interest from the maturity thereof until paid at the rate of 6 per cent. per annum. And I hereby specially agree that if this note is placed in the hands of an attorney for collection, or if collected by legal proceedings, to pay ten per cent. additional on the principal and interest due hereon as collection fees.        Valentine Wiess.

| Consideration. | | When Due. |
| --- | --- | --- |
| Cash .............. | $2,666 67 | |
| Note No. 1......... | 2,666 67 | Ap. 26, 1908. |
| Note No. 2......... | 2,666 66 | "  "  " |
| | $8,000 00" | |

Indorsed:
"Lawrence Hyde. Katherine B. Hyde. Apr. 21, 1908. Pay Hutchings Sealey & Co., Galveston, Tex., or order. The People's Bank, N. Y. Wm. Milne, Cashier.
"Pay to the order of any bank or banker, all prior indorsements guaranteed. Apr. 24, 1908. Hutchings Sealey & Co. Unincorporated, Galveston, Tex.
"Paid, Collection Department, May 26, 1908. First National Bank, Beaumont, Texas."

"Beaumont, Texas, May 26, 1908. No. 3497. The First National Bank of Beaumont, United States Depositary: Pay to the order of yourselves $2,748.00, twenty-seven hundred forty-eight and no/100 dollars. McFaddin-Wiess-Kyle Land Co., by W. P. H. McFaddin, President."

Indorsed:
"Paid, Collection Department, May 26, 1908. First National Bank, Beaumont, Texas."

The witness further testified:

"The books at that time were kept by Mr. W. M. Miller. I directed the entries. The entry in this book shows that the bank was credited,

and real estate charged with the amount of the check $2,666.67, and the explanatory note is that it is for one-third, cash payment on the Hyde interest in the Cunningham survey. The payment by check of $2,746, and that entry on May 26th charging to real estate V. Wiess note and interest $2,748, represent the transactions as shown by the books, paying principal and interest. The original payment and those on April 24th and May 26th of the next year represent the original payment and the payment of the two notes. I have been with the McFaddin-Wiess Land Company for 14 years, up till when it went in the hands of a receiver. It went in the hands of a receiver last year. Since my connection with the company Mr. McFaddin has been its active manager with reference to these lands and rive business. He has been the active controller and manager of all that business. He was left in charge by the other two parties. Mr. McFaddin consulted them from time to time, but he was in active management of the company."

L. J. Davis testified:

"I was in the employ of V. Wiess about ten years, from 1904 until his death in 1913. I was confidential clerk and bookkeeper. I kept his private books. I saw the journal yesterday. I didn't see the ledger. I remember this transaction. I didn't see the cashbook entry. I made that ledger entry. That is the cashbook entry, 'Check to R. A. Green,' and then credit McFaddin-Wiess-Kyle Land Company on the Hyde land purchase with $2,666.67. I made those entries. I see that entry in the journal, 'To Hyde Land Purchase,' 400 acres in the D. Cunningham survey, charging McFaddin-Wiess-Kyle Land Company with $8,000. I made that entry. Those entries were made by the instructions of Mr. Wiess. He instructed me to make those entries on the books, and that is why I made them. They represent the instructions he gave me at that time."

Lysander Houk testified as follows:

"I am the son-in-law of Mr. W. P. H. McFaddin. I have been connected with the McFaddin-Wiess-Kyle Land Company since 1909. After the determination of this suit of Chaison against McFaddin, I had a conversation with Mr. V. Wiess relative to the title held by him under the Hyde heirs, and relative to a deed taken by him from the Hyde heirs. I asked Mr. Wiess if he would deed this part of the Cunningham to the land company, and he said 'Yes;' and he said, 'Find the original deed to me, and copy it,' and give it to him and he would sign it. Well, I made several searches for it, and I couldn't find it in his papers, or the land company's papers, so finally I came down to the records and copied the original deed, and took it out and took it to Mr. Wiess. In the meantime, of course, I hadn't understood that he was going to get sick, but he was sick and had gone to Mineral Wells, and so I just stuck the blank deed in my desk, and when he came back from Mineral Wells I took the deed to his house, and I saw him and talked to him, and he said he didn't feel well enough to talk business, and for me to bring it back when he felt better, and a few days after he was still feeling bad, and as a matter of fact he died shortly after that. I should say it was possibly two or three months after he told me to prepare that deed for him that he died. He lingered along sick during that time. I don't remember the month that he died; it was within two or three months possibly."

The following deed was shown the witness, and he testified:

"Those are the true signatures of Laura E. Wiess, P. H. Wiess, Mrs. Hal H. Branham, and Hal H. Branham."

The deed is as follows:

"The State of Texas, County of Jefferson.

"Whereas, by deed dated October 26, 1907, Laurance Hyde, Margaret A. Hyde, and Katherine B. Hyde, for and in consideration of eight thousand ($8,000.00) dollars paid and secured to be paid V. Wiess as follows, to wit, two thousand six hundred and sixty-six and $^{67}/_{100}$ ($2,666.67) dollars in cash, and the balance in two notes for the aggregate of five thousand three hundred and thirty-three and $^{33}/_{100}$ ($5,-333.33) dollars, conveyed to V. Wiess a certain tract of land out of the David A. Cunningham survey in Jefferson county, Tex., which land is hereinafter more particularly described in this instrument; and

"Whereas, on October 31, 1907, the McFaddin-Wiess-Kyle Land Company reimbursed and paid over to said V. Wiess the said two thousand six hundred and sixty-six and $^{67}/_{100}$ ($2,666.67) dollars cash, assumed and afterwards fully paid off both of said notes given by said V. Wiess as aforesaid; and

"Whereas, said V. Wiess departed this life on the 30th day of July, A. D. 1913, leaving entries upon his account books evidencing that the said sum of eight thousand ($8,000) dollars was paid to him as aforesaid by the McFaddin-Wiess-Kyle Land Company, which company is now through its board of trustees demanding of the heirs of V. Wiess, deceased, a written conveyance of said land out of the David A. Cunningham survey to it, the said McFaddin-Wiess-Kyle Land Company, upon the ground that it, by a verbal agreement, purchased said land from him, the said V. Wiess, for which said McFaddin-Wiess-Kyle Land Company paid the said V. Wiess the eight thousand dollars ($8,000.00) as aforesaid, but that no deed has ever been executed to them therefor; and

"Whereas at a call meeting of the board of trustees of said McFaddin-Wiess-Kyle Land Company had on the 13th day of November, A. D. 1913, the surviving members thereof, to wit, W. P. H. McFaddin and W. W. Kyle, duly and regularly elected P. H. Wiess as a trustee of said McFaddin-Wiess-Kyle Land Company to fill the vacancy on said board caused by the death of said V. Wiess:

"Now, therefore, know all men by these presents that we, Laura E. Wiess, surviving wife of V. Wiess, deceased, of the county and state aforesaid, and P. H. Wiess, also of said county and state, and Mrs. Hal H. Branham, joined by her husband Hal H. Branham, of Bexar county, Tex., constituting all and the only heirs at law of V. Wiess, deceased, for and in consideration of the premises and the sum of eight thousand ($8,000.00) dollars paid to V. Wiess prior to his death as aforesaid by W. P. H. McFaddin, V. Wiess, and W. W. Kyle, trustees for the McFaddin-Wiess-Kyle Land Company, have granted, sold, and conveyed, and by these presents do grant, sell, and convey, unto the said W. P. H. McFaddin, P. H. Wiess (successor of V. Wiess on the board of trustees aforesaid), and W. W. Kyle, constituting the present three trustees for the McFaddin-Wiess-Kyle Land Company, of the county of Jefferson, state of Texas, all that certain undivided one-half (½) interest in and to the following tract of land in Jefferson county, Tex., and more particularly described as follows: All that certain one-fourth (¼) of a league of land containing one thousand one hundred and seven (1,107) acres patented to David A. Cunningham, abstract No. 15, patent No. 581, volume 22 of the patented lands, and appearing on the official map of Jefferson county, Tex., as lying south of the P. Humphrey survey, the south line of said Humphrey survey being the north line of said Cunningham survey, excepting the portion thereof to which the said V. Wiess claimed no interest, and which excepted portion is described as follows: Beginning on the south line of the Pelham Humphrey league at the point where the east bound-

ary line of the right of way of the Sabine & East Texas Railway intersects the said Humphrey south line fifty (50) feet east to the center of the main track of the Sabine & East Texas Railway; thence east 1,730 varas to the northeast corner of the said D. Cunningham survey; thence south on the D. Cunningham east line 1,380 varas to a point 200 varas from the southeast corner of the D. Cunningham survey; thence in a northwesterly direction along the line of the W. P. H. McFaddin pasture fence as it stood February 7, 1885, 2,184 varas to the place of beginning—and to include all of the D. Cunningham survey enclosed in said McFaddin pasture.

"But the land herein conveyed in this deed is the interest which vested in Laurence Hyde and Katherine B. Hyde as heirs at law of Joshua V. Hyde, deceased, and whose title thereto was confirmed by a decree of the United States Circuit Court for the Eastern District of Texas at Beaumont, Tex., entered on December 12, 1905, in the cause in equity entitled 'Laurence Hyde and Katherine B. Hyde v. W. P. H. McFaddin et al.,' which said decree was filed for record in the office of the clerk of the county court of Jefferson county, Tex., on the 10th day of January, 1906, and duly recorded on the 11th day of January, 1906, in the Deed Records of said county in Volume 89 on pages 180 to 183, inclusive, reference to which is hereby made for more complete description, and being the same land conveyed to V. Wiess by Laurence Hyde and Margaret A. Hyde and Katherine B. Hyde by deed dated the 10th of October, 1907, recorded in the Deed Records of Jefferson county, Tex., in Volume 99, page 458.

"To have and to hold the above-described premises, together with all and singular the rights and appurtenances thereto in any wise belonging, unto the said W. P. H. McFaddin, P. H. Wiess, and W. W. Kyle, trustees for the McFaddin-Wiess-Kyle Land Company, their successors and assigns, forever, and we do hereby bind ourselves, executors and administrators, successors and assigns, to warrant and forever defend all and singular the said premises unto the said W. P. H. McFaddin, P. H. Wiess, and W. W. Kyle, trustees for the McFaddin-Wiess-Kyle Land Company, their executors, administrators, successors, and assigns, against every person lawfully claiming or to claim the same or any part thereof, by, through, or under us as the only heirs of V. Wiess deceased.

"Witness our hands this the 18th day of December, A. D. 1913.

"Mrs. Laura E. Wiess.
"P. H. Wiess.
"Mrs. Hal H. Branham.
"Hal H. Branham."

This deed was duly acknowledged by each of the parties signing same.

The witness further testified that he was acquainted with V. Wiess in his lifetime, and his family; that he was not related to the family; that he knew what children V. Wiess left; that he left a son, P. H. Wiess, and a daughter, Mrs. Hal B. Branham, and his surviving widow was Mrs. Laura E. Wiess; that the parties to that deed are the only surviving heirs of V. Weiss.

The remaining testimony of the witness was as to the delivery of the deed, he testifying that to-day was the first time he ever saw the deed, and that he did not know when it was delivered, and by whom; that up to the time of the receivership he had never had possession of the deed, and that he did not know whether the McFaddin-Wiess-Kyle Land Company had possession of it or not; he never heard of them having possession of

it; that he had no idea as to when and by whom the deed was delivered and knew nothing about it; that usually when a deed was made, and he had it recorded, it came back to the office; and that, if a deed was recorded by anybody else, it came back to the office.

There was introduced in evidence a paper claimed to be the answer of P. H. Wiess, Laura E. Wiess, and Mr. and Mrs. Hal H. Branham in cause 10046, entitled Texas Rice Land Company v. McFaddin-Wiess-Kyle Land Company et al., filed November 24, 1913, in the district court of Jefferson county. The instrument is as follows:

"Texas Rice Land Company v. McFaddin-Wiess-Kyle Land Co.

"First. Now comes P. H. Wiess, Laura E. Wiess, Hal H. Branham, and Mrs. Ruth Branham, defendants in the above-entitled cause, by their attorney, Geo. C. O'Brien, and for answer herein deny all and singular the allegations in plaintiff's petition contained, and say that they are not guilty of the injury, wrongs, and trespasses charged against them, and of this they put themselves upon the country, pray judgment, etc.

"Second. For further answer said defendant say that heretofore, to wit, on the 16th day of January, A. D. 1909, in the district court of the Fifty-Eighth district in and for Jefferson county, Tex., in a certain suit pending, numbered and styled on the docket of said court as No. 2694, Clara Chaison et al. v. W. P. H. McFaddin et al., wherein Texas Rice Land Company, the plaintiff herein, was one of the parties plaintiff, and V. Wiess, from whom these defendants inherited such title as they hold in and to the land herein sued for, was an intervener, and which said suit was for the same cause of action as mentioned in plaintiff's petition herein, judgment was rendered in favor of said V. Wiess, intervener, as against all the other parties therein, including Texas Rice Land Company, plaintiff herein, decreeing the land described in plaintiff's petition herein unto the said V. Wiess, intervener, and quieting and perfecting his title thereto, all of which more fully appears in said judgment recorded among the Civil Minutes of the District Court of the Fifty-Eighth Judicial District in Jefferson County, Tex., in Volume 6, pages 370 to 373, referred to as a part of this plea, and which said judgment remains in full force and effect, in no wise reversed, satisfied, or made void, and is res adjudicata of all issues herein as against the said heirs and legal representatives, of the said V. Wiess; wherefore they pray judgment of the court.

"Third. Further answering herein, defendants specially deny each of the allegations contained in the third paragraph of plaintiff's petition wherein it is alleged that defendants wrongfully excluded plaintiff from said premises, unlawfully appropriated the possession, use, rents, and revenues of and from said premises, damaged plaintiff in the sum of $10,680, and will further injure and damage plaintiff, etc., that defendants have wrongfully withheld and are continuing to wrongfully withhold the said rents and premises to plaintiff's damage, etc., to all of which defendants require strict proof, put themselves upon the country, pray judgment, etc.

"Fourth. Further answering herein, these defendants upon information and belief allege the following explanatory facts, to wit: That on or about October 26, 1907, Lawrence and Katherine B. Hyde for a valuable consideration conveyed to V. Wiess an undivided one-half interest in and to the David Cunningham survey containing 1,107 acres; that the McFaddin-

Wiess-Kyle Land Company paid or assumed the payment of the consideration for said land so conveyed to V. Wiess as aforesaid, and that these defendants now consider that, though the title be in the name of V. Wiess, the said McFaddin-Wiess-Kyle Land Company are the real owners of said land sued for, and in favor of whom only, these defendants, being the only heirs of V. Wiess, deceased, disclaim any interest in and to the title to said land.

"That, V. Wiess having departed this life in Jefferson county, Tex., on the 30th day of July, A. D. 1913, these, his heirs, are not fully informed as to all the circumstances incident to the purchase by him of said land, but, being creditably informed that it was a purchase by the McFaddin-Wiess-Kyle Land Company in the name of V. Wiess, deceased, should be and in any wise are responsible as individuals for anything which may have been done in the management, use, and occupancy of said premises during the time said title stood in the name of V. Wiess.

"Wherefore these defendants pray that plaintiffs take nothing as against these defendants in their individual capacity, and that they go hence without day and have judgment for their costs," etc.

There was, and still is, the contention of appellee that V. Wiess had no title to the land in controversy at any time, but that the same was taken in his name in trust for the McFaddin-Wiess-Kyle Land Company, and one of the main questions in the case is whether, under the facts, attending the purchase of the land by the McFaddin-Wiess-Kyle Land Company from the Hyde heirs, and having the land deeded in the name of V. Wiess, did a trust arise in the land for the benefit of the McFaddin-Wiess-Kyle Land Company? We thought it, perhaps, needful to present this explanation of the issues.

The trial resulted in a directed verdict for the plaintiff for an undivided one-half interest in the land, except the portion conveyed to W. P. H. McFaddin, and the portion occupied by the Texas & New Orleans Railroad Company's right of way, and in favor of the defendant for the other one-half of said land, and this appeal is taken from the overruling of the motion for new trial.

Appellant's first assignment of error is as follows:

"The court erred in the second paragraph of its charge which is a peremptory instruction to the jury to find in favor of plaintiff for an undivided one-half of all the land sued for by plaintiff less that tract of 238.52 acres which was conveyed by Jef Chaison and J. M. Hebert to W. P. H. McFaddin February 7, 1885, and also less that portion of said Cunningham survey occupied or used by and included in the right of way of the Texas & New Orleans Railroad Company because, if the evidence is sufficient to show that V. Wiess held said portion of said land in trust for said McFaddin-Wiess-Kyle Land Company, the evidence also further shows that it was agreed by said V. Wiess and said W. P. H. McFaddin, president and manager of the said McFaddin-Wiess-Kyle Land Company, and acting for said land company, that the title to said land should be taken in the name of the said V. Wiess individually at the time of the execution and delivery of the deed from said Hyde heirs to the said V. Wiess with the understanding that the said land company should pay the consideration therefor, and that the said V. Wiess would afterwards convey said land to said land company, all of which agreement was for the purpose of hindering, delaying, preventing, defrauding, and to defeat defendant and its predecessors in title in the collection of the rental value of its part of the land company, from the defendant and its successors in title and the true owners of the other half interest in said land, and to embarrass them in the establishment of their rights to the rents therein, and therefore such trust as claimed by plaintiff in this case should not be and cannot be in equity and good conscience enforced by this court, and, defendant being in possession of said land, it was error in the court to instruct a verdict in favor of plaintiff therefore."

It would perhaps be well to reproduce the testimony of R. A. Greer and Hal W. Greer; they being witnesses who apparently are connected with and apparently having known the circumstances of the transaction of the purchase of this land. R. A. Greer testified as follows:

"I have acted as attorney for the McFaddin-Wiess-Kyle Land Company, V. Wiess, and McFaddin and those parties. My firm organized the company. I had something to do with the transaction by which a title to a half interest in the D. Cunningham survey was conveyed by the Hyde heirs to V. Wiess. We had a suit for the title with the Hyde heirs in the federal court, and we lost the case. That was in the United States court here— No; I believe we won the case here, and in New Orleans they reversed it and we lost. They sued Mr. W. P. H. McFaddin individually, and we became convinced that the Hyde heirs owned the property, and so advised our client, and then Mr. McFaddin began some negotiations (just what, I don't know) looking to the purchase; at all events he found out what the land could be bought for and reported, I think, to my brother—my brother was a partner of mine at that time in the firm, that is my brother, Hal W. Greer—and the land could be bought for $8,000. Mr. V. Wiess came up to our office seeking to get information about it, and I don't know how to express myself except to say that Mr. Wiess told us that McFaddin had seen my brother, and my conversation was with Mr. Wiess over the purchase of this land. I don't remember whether Mr. Winslow was here at that particular time or not; I am inclined to think he was, either he, or his wife, or one of the heirs, and he was a lawyer in the case, who lived in New York, representing the Hyde heirs, in whom the title to the land was at that time; and the trade for the land was conducted between Mr. V. Wiess, Mr. Winslow, and myself. It resulted in a sale and a purchase. The only conference about the purchase of this land was between my brother, Hal W. Greer, and Mr. McFaddin, in the first instance. There was a conference in which the purchase of this land on behalf of the company was discussed; yes, sir; the Hyde half. Mr. Wiess stated to me that he didn't want the land; that he wanted to buy the land for the land company, and he had been advised by my brother—now that part of it I didn't hear, but he said he had been advised by my brother that McFaddin ought not to buy the land, and that he wanted to buy it, and wanted to buy it for the land company. He and Mr. Winslow traded, and I see from the McFaddin books—of course, I don't remember that myself, but I see from the books—that the check was made out to me, $2,666 and some cents, which I believe was a third of the purchase money; at all events the trade was one-third cash, and the two notes, I think. Mr. Wiess asked me this question: 'If he bought that land and was to happen to die, what would become of the title? He didn't like to be mixed up in that kind of a thing.' And I said it was very easy to convey it to the land company, and they might or might not put the

deed of record, as they saw fit, and he said: 'All right, go ahead and fix it up.' I prepared a deed conveying this half interest from V. Wiess to the land company. I gave it to Mr. Wiess, and I don't know what became of it. I suppose he took it for the purpose of executing it; he asked me to write the deed, and I did. I never saw it afterwards. I never heard him claim the title individually in my life. I represented Mr. Wiess for many years after that, and also the land company. I represented Mr. Wiess practically up to his death and Mr. McFaddin, both of them, and the land company and Mr. Kyle. I represented all three of them.

"I believe Mr. Wiess intervened in one or more suits after taking this title. In intervening in those suits my firm was first paid by McFaddin, Wiess & Kyle and, after the land company was organized, by the land company. In organizing the land company we merely changed the form of the partnership. One was a partnership, and the other a joint-stock company. Both of them were generally known as the land company, or the land department of their business. They operated in there, and it was the outgrowth of the old McFaddin-Wiess-Kyle Pasture Company that sold out, you know, to the Port Arthur people. I don't think I ever had any other conversation with Mr. Wiess with reference to this transaction. I investigated my books pretty carefully, and I found that every cent I collected in subsequent litigation involving the title to this Cunningham land was paid either by the land company or the partnership; there isn't a charge against V. Wiess concerning those lands—any of those lands. Nobody except Mr. Chaison, other than the land company, ever asserted any claim to this land after its purchase by V. Wiess in 1907. Neither Mr. Wiess nor Mr. Kyle nor Mr. McFaddin individually asserted any claim; it was the property of the land company.

"I was speaking with reference to the part that V. Wiess bought from Hyde. I knew of the various litigation over this land since 1901; it woud be pretty hard for me to detail it. I am acquainted with it. Early in 1901 I represented the McFaddin, Wiess & Kyle partnership technically, not the land company. I didn't know in 1901 and 1902 that the land company had these lands in possession and had them fenced; I did not know anything about that. I knew where the pasture was down there. I knew where the old Beaumont Pasture Company's fence was, and I am inclined to think they took it in; that was a big pasture. I don't remember dates. I know that Chaison brought suit against McFaddin for the Cunningham land. I don't know, but I think he claimed that the land had been fenced in that suit. I was one of the attorneys in that suit. I think that litigation over that land was begun in 1901. I thought it was first tried in 1907; possibly it was in 1909; I don't know. I was the attorney for the defendant in that suit continuously. During that time I knew what the pleadings said as to the rights that were set up against the Chaisons, but I couldn't undertake now to say what the pleadings were. There was a whole raft of those suits, you know, and all spindletop was involved in various and sundry suits; the Humphries and the Douthitt and the Veatch were all involved.

"I recall that the Gleisis heirs intervened in that Chaison suit, represented by Judge Watts. I think they were claiming a half interest in the Cunningham land. I was attorney for the McFaddin-Wiess-Kyle Land Company at the time there was a partition between the Gleisis heirs and McFaddin. At the time Mr. Wiess came to me in regard to purchasing this land, when McFaddin sent him, I knew the condition as to that land, and the various claims over it, as represented by that lawsuit. I knew that the Gleisis were claiming, and that the Chaisons were claiming. I knew whatever those pleadings set up. I couldn't undertake to tell you now what they did set up, but I was thoroughly acquainted with them at that time. I only knew from their telling me so that the McFaddin-Wiess-Kyle Land Company or the partnership had been in possession of the land. I wasn't out there. They advised me that they were in possession of the land. That case between the Chaisons and the Gleisis heirs and others claiming that land was finally tried here in the district court in 1909 the first time. I was present at that trial. I wasn't present all the time, because Mr. George Greer, who was conducting the case for the Chaisons, admitted the Wiess title, and there was nothing more for me to do. I wasn't representing McFaddin in that case; I was representing Mr. V. Wiess only. However, I want to explain that that was under my original contract; they so regarded it, and Mr. V. Wiess so claimed, that that was under my original contract, and did not pay me for my services in representing him in that case. By my original contract I mean my land company contract. I have got about two pages of a book down there that certain cases were set aside and the fees agreed on. This Cunningham, the Humphries, and the Veatch were all under that contract. That was my employment by the land company to represent those titles, those litigated cases, and they claimed that my employment went to this suit, and I carried it on through. I think, however, that my brother was more engaged in the trial of that case than I was. He was here practically all the time, and I wasn't.

"I am acquainted with this plea of intervention filed on the part of V. Wiess on January 8, 1909. I know now in a general way. I then knew all the facts. We prepared it in our office. When you say the plea of intervention sets up that the title to that land was in V. Wiess, it was in V. Wiess. There is no doubt about that. I think Mr. McFaddin was a party to that suit. Judgment was taken in that suit in favor of V. Wiess; I don't know whether it was against Mr. McFaddin; I don't know just what the terms of the judgment was. V. Wiess recovered the property as against everybody, everybody to the suit, whatever was conveyed to him, whatever we intervened for.

"I think possibly I might say that I was mistaken when I stated awhile ago that I never heard Mr. Wiess claim that land; but he was claiming it for the land company. As a matter of fact the pleadings show that he was claiming it in his own name. There isn't a word said in that pleading that that land was claimed by him for the McFaddin-Wiess-Kyle Land Company. He said, 'That is my land, and I am seised and possessed of it.' That was as late as 1909. Mr. McFaddin was a party to that suit, and made a party defendant by the original claimants, I believe. Mr. V. Wiess recovered whatever the Hyde heirs had of the Cunningham survey, as against all parties to the suit. As far as I know, nothing was said in that suit of any claim by Mr. McFaddin, who was one of the trustees for the concern and one of the interested parties owning a half interest, that that concern owned it, nor of any claim by Mr. V. Wiess that that land belonged to the company. Mr. Perry McFaddin did take the stand as a witness in that case, in which the plea of intervention of V. Wiess was filed, claiming the land. I think I was present when he took the stand and swore in the case.

"I was one of the attorneys representing the intervener V. Wiess in that suit, claiming that land as his individual property. I think I know why he didn't disclose the fact that he was only holding that land in trust for the McFaddin-Wiess-Kyle Land Company. It grew out of a conflict existing between Mr. McFaddin and Mr. Charlie Chaison several years before that time, and my brother thought it was best for the title not to pass through McFaddin to the McFaddin-Wiess-Kyle Land Company. He

didn't want to disclose that it was in McFaddin. It is true that counsel here claim that it would not have been in McFaddin if it had been in the land company; it would have been in the land company; but the way we took it, any notice that McFaddin had would be carried to the land company. I think that notice to McFaddin would be notice to the land company; that is, if McFaddin knew anything. I assume that to be the reason why he didn't disclose the true state of the title, as the plaintiff in this case claims that it was at that time. V. Wiess was absolutely ignorant of the land titles of all their land. McFaddin was the manager, as you have stated. He was the general manager, and his name was on the paper. I never did know of any reason why Mr. McFaddin would have sworn that way, if he swore that way. I would like to say this, that possibly you gentlemen and the jury·might get a wrong conception of what I have said, or what I have testified. That title we took, traded for and took it, with the distinct understanding with Mr. V. Wiess that he was buying it for the land company. Now the deed was made to V. Wiess. I pleaded in that case that he had title individually, and the deed was in him individually. Now as to the equity between the parties, that is a different proposition. I believe that is what this court is to determine now. I think Greer & Greer engineered how we should plead that. I don't think either McFaddin or Wiess said anything to us about it. That title was in jeopardy, and we interpleaded for V. Wiess. I don't remember any conversation with V. Wiess at all about that particular suit. I don't say I didn't have any, but I don't remember of having any discussing with him about the case. I think in that particular suit Mr. Chaison admitted that V. Wiess had title to the Hyde interest. I know his lawyer did. McFaddin was sued, and we intervened for V. Wiess; V. Wiess wasn't sued by Mr. Chaison, that is correct. When he came in setting up that he owned it individually, it is true that Mr. Chaison admitted it. Mr. V. Wiess took a judgment for it individually, as against McFaddin, as against the company and everybody else, as to the Hyde interests. It is my recollection that Mr. Chaison took a judgment for the other half interest in the Cunningham survey against all of them. However, the judgment will settle all of that. I don't remember whether that was settled by judgment in 1912; final judgment was taken in that case.

"If there was any reason for hiding the true state of this title prior to that time, I don't know that it ceased as early as 1912. I don't hardly know how to answer your question. I thought it was better for some reason not to let it appear that the title was in the land company up to that time. It is true that that reason had ceased as early as 1912, because the Hyde interest was cleared up by that judgment. As between Kyle and McFaddin and Wiess, I don't think the matter was ever discussed at all. They understood why V. Wiess bought it, and how he paid for it.

"I think the suit in the federal court by the Hydes was against McFaddin and the Chaisons. That suit was finally determined in favor of the Hydes against McFaddin and the Chaisons. In 1909, at the time of this intervention (of V. Wiess), that judgment was in existence and had settled the rights of the parties in that matter. I think that the judgment of the federal court is prior to the intervention that you hold in your hand there in that case, because the deed had been executed by the Hydes to Wiess. I don't think it was disclosed by Wiess, or myself, or by Mr. McFaddin as to the reasons why we should file this intervention in this other suit; I don't remember about that part of it. The title was settled as against the Chaisons at that time. I don't remember if it was against Mr. McFaddin. I know that we intervened in there for V. Wiess, and it seems to me that George Greer sued for the entire tract—I am not sure about that—and we came in and intervened, claiming that we owned the Hyde interest in it. I understand that the Chaisons and the Hydes had settled their interests, through litigation in the federal court. My recollection is— Just why we did it I don't know, but my recollection is that George Greer sued ·for the entire tract, less the 208 acres, and that we, intervened in V. Wiess' behalf, setting up the purchase from the Hyde heirs, but, whether we acted wisely or not, I can't say, but that is what we did.

"The McFaddin-Wiess-Kyle Land Company when it was a partnership was owned by W. P. H. McFaddin, V. Wiess, and Wesley Kyle. McFaddin owned a half interest and the others a quarter each. When the joint-stock association, the McFaddin-Wiess-Kyle Land Company was formed, the ownership was the same. At first the McFaddin-Wiess-Irrigation Company was a corporation, and it was afterwards dissolved. They organized that on the same terms, McFaddin a half interest, and they a quarter each, and the mill company in the same way. That was passed into the McFaddin-Wiess-Kyle Land Company; yes, sir. The irrigation company was dissolved by mutual consent, and deeded over to the land company its right of way and pumping plant and all that sort of thing."

### Hal W. Greer testified:

"My name is Hal W. Greer. I am the brother of R. A. Greer, who has just testified, and was a member of the law firm in 1907 when the transaction took place for the purchase of the Hyde interests. With reference to what I know about the purchase of the land, whether V. Wiess purchased it for himself or the land company, I will go back a little bit. In 1901 the Hyde heirs filed a suit in the federal court here; I don't remember whether it was a case in equity or whether it was on the law docket, but it involved the title to one-half interest in the Cunningham survey. In that suit we set up by limitation title to something over 200 acres; I think it is 256 acres; I don't remember. That was on the inside of the Beaumont Pasture Company fence. The Cunningham, as I understood it, lay on the other side. We recovered for the defendants in the suit that 200 and odd acres, whatever the amount was, but, as to the land lying outside of the inclosure, it was recovered by the Hyde heirs. I don't remember when that case went to trial. I think, though, it was in 1904; at all events the mandate did not come back until the latter part of 1906 or the beginning of 1907. After the mandate came back, Mr. McFaddin, W. P. H. McFaddin, came into my office and asked me if he could buy that Hyde interest. Now at that time there was a controversy between him and Mr. Charlie Chaison. They were at outs, or disagreement, and there was also pending at that time a suit that was originally filed by Clara Chaison and others, the widow of Judge Jef Chaison, and the heirs of the Chaisons, against W. P. H. McFaddin for the Cunningham survey. Subsequently one of Charlie Chaison's companies—I think it was the American Oil & Refining Company—intervened, and set up it had whatever title the Chaisons had, and it became the plaintiff in lieu of the Chaison heirs. That suit was pending when this mandate came back from the Circuit Court of Appeals at New Orleans. Well, I was more or less familiar with what Charlie was charging in that suit; I can't state it from memory now, but it was quite fresh with me then. So Mr. McFaddin came up in my office and asked me if he could buy this Hyde title. I told him that I thought it would be very injudicious for him to buy that title in view of the relationship between himself and the Chaisons. He didn't say who he wanted to buy it for, whether himself or somebody else; he asked me if he could

buy the land. 'Well,' he says, 'what do you advise me to do then?' and I said, 'Well I advise you to get somebody else to buy it that isn't mixed up in this trouble you are having with the Chaisons.' Well, he left my office, and either that day or within a reasonably short time afterwards Mr. V. Wiess came into my office, and he asked me the question if he could buy the land. He didn't say whether it was for himself or the land company or what, and I told him I thought he could. The consideration at that time I don't remember. I have been over the books here since, on yesterday, I believe, and it states the consideration to have been $8,000; I knew it at the time, but my memory wouldn't justify me in stating what was the consideration, nor the method of payment, but I know that Mr. V. Wiess bought it under those circumstances. I have seen memoranda here. I won't state the substance of them, but my impression was that he was buying it for the land company.

"Now we had been employed first by that firm, McFaddin, Wiess & Kyle, when they were partners. We represented them in all of their business, and they advised with them in all of it, and a great deal of it never got into litigation at all, and a great deal of it did. We were first their attorneys. Well, they decided, I think it was along about 1904, to make a sort of joint-stock association. I had figured in drawing up the articles of association for the Port Arthur Land Company and the town-site company, and they wanted to make a similar company for themselves, so I think it was in 1904 that they changed it from a partnership to this joint-stock association. I don't know whether you have got any data showing that or not, but that is my memory.

"Now after V. Wiess bought this title we had a conference, and we had the title papers. I think I dictated the pleadings in that case that appear to have been filed in January, 1909. I think I dictated the pleadings in that case, and I was surprised when they said 1909, because my memory was that the trial was had in 1912. If that was the second trial, well, it was the second trial I was most interested in. On that trial Mr. George Greer was representing the American Oil & Refining Company, Charlie's company. I was here and attended the trial, and we introduced no evidence on behalf of V. Wiess except the deed from the Hyde heirs, and Mr. Greer conceded we had the title, and we were merely onlookers. Mr. Duff was the active lawyer in the trial, representing both the land company and Mr. McFaddin. I don't know whether the land company was a party to that suit or not. If the land company was not a party, he was representing Mr. McFaddin. If that issue came up in the trial between McFaddin and Chaison—that is, in the testimony—I don't remember. I remember we just simply read our deed and took our judgment on our plea in intervention.

"When Mr. McFaddin came to me in regard to purchasing the Hyde interest, I was more or less familiar with the various charges and claims made by Chaison in that suit, but I couldn't recite the details now. That suit was filed in 1901. I remember that. The trial that I spoke of was some time about 1907. I think I was familiar with the contentions of that suit, and the amended petition of the Chaisons of January 2, 1904, at that time. I am not now. When I refer to the claims and charges of the Chaisons I have reference to that paragraph in the petition which reads: 'That the defendant W. P. H. McFaddin heretofore, to wit, in the month of February, 1901, by violence and force and fraud wrested the possession of said premises from your petitioner, and those whose estate it holds, and ejected them therefrom, and has appropriated the possession and use of and the rents and revenues from said premises ever since; that the reasonable rental value or the value of the use of said premises is the sum of $6 per acre per year, of which rents and use the defendant has deprived your petitioner and those under whom it holds, and has appropriated the same to his own use and benefit since February, 1901, to the damage to your petitioner in the sum of $16,182 up to this date, and that such damage will continue at the rate of $6 per acre per year as long as defendant withholds possession of said premises from your petitioner; wherefore your petitioner prays that it recover of the defendant W. P. H. McFaddin, who has already been cited in this suit, said premises and the title to and the possession of the same, and its damages aforesaid, for costs of suit and general relief'—and a good many other things. Charlie and Perry were not at all friendly at that time. There were a good many charges and countercharges there. I had, though, the allegations in that pleading in mind at the time I advised Mr. Wiess he could buy the land, and at the time I prepared that plea of intervention, and at the time of the trial.

"My interpretation of the decree in the federal court suit was that it had settled the title in favor of the Hydes as against the Chaisons. I thought it was a mighty strong one, all except the 200 odd acres. I thought the title was as well settled by that judgment as it would be after they had a judgment in this court to that effect. My opinion as a lawyer was that it knocked us out completely. That didn't involve the whole survey, though. That only involved the half title. The other half, as I remember it, went into some party named Gleisis. That wasn't adjudicated in the federal court suit at all, I don't think; that is my memory; it wasn't involved."

[1] It is to be gathered from this testimony that there was ill feeling existing between McFaddin and the Chaisons, and that that was the principal reason that the title was taken in V. Wiess' name, and not in the name of the McFaddin-Wiess-Kyle Land Company, and a desire not to be involved in litigation by the McFaddin-Wiess-Kyle Land Company. It furthermore appears that the land company had large properties, irrigating canals, pumping plants, land, and warehouses, and there is nothing in the record, so far as this court can discover, that any judgment which could have been recovered against the McFaddin-Wiess-Kyle Land Company would not be satisfied out of its property, and as we view the testimony, having carefully gone over the same, there is no evidence of an attempt to place any property beyond the reach of the creditors and to avoid payment of its debts by the McFaddin-Wiess-Kyle Land Company. As intimated by counsel in the case, the inference was:

"That it did not desire to do anything which would provoke appellant or its predecessors in title to institute suit against it, and it desired to keep out of litigation then pending, it never having been made a party thereto."

The proposition presents itself whether or not the record reflects any right in appellant to have any voice in the matter of saying how the McFaddin-Wiess-Kyle Land Company should take the title to lands which it purchased and paid for, and whether there is anything in the record which makes it the duty of said land company to inform appellant that their occupancy of the land was by

virtue of a lease contract from the adversaries of the Chaisons in the Gleisis suit.

[2] As contended by one of the counsel in the case:

"Is there any legal or equitable principle which requires the party to go to another and furnish him with information on which to institute a suit against him, and is that a duty imposed by the law? Unless such a duty exists, there was no right on the part of Chaison to demand that McFaddin-Wiess-Kyle Land Company disclose its information, and in absence of such a right in said Chaisons there could be no corresponding duty on the part of McFaddin-Wiess-Kyle Land Company, and there could be no wrong."

We are much impressed with the apparent truth of the proposition above, there not being any testimony in the record showing that McFaddin-Wiess-Kyle Land Company was insolvent, or was attempting to transfer or conceal property for the purpose of placing it beyond the reach of its creditors, and, on the other hand, the whole record reflecting that, had the appellant been able to establish a cause of action against the McFaddin-Wiess-Kyle Land Company, any judgment that might have been recovered might have been easily paid and satisfied. Indeed, there is another phase of the case that appeals to us very strongly. The statute with reference to fraudulent conveyances is to the effect that such conveyances shall, as to creditors, be void, but is subject to be avoided by a creditor only, and we believe, under this view of the matter, that if the land in controversy had been transferred to V. Wiess for the purpose of hindering or defeating the creditors of the McFaddin-Wiess-Kyle Land Company, nevertheless the conveyance would have been valid as between the parties, and only subject to attack in a proceeding to subject it to a debt.

Attention has been called to the case of Stephens v. Adair, 82 Tex. 214, 18 S. W. 103, which, in our opinion, announces the correct principle, and in which the following language is used:

"A fraudulent conveyance is valid and binding between the parties themselves, and can only be set aside by creditors, purchasers, or other persons intended to be defrauded. Although pronounced void by the statute, it is only voidable, because it is valid except as to the persons named. Rev. St. art. 2465; Fowler v. Stoneum, 11 Tex. 500 [62 Am. Dec. 490]. The conveyance by Stephens to Adair was valid as between them, although it may have been successfully attached and set aside by the Olds Wagon Works as made with the intent to defraud them of their debt. It could have been set aside only to the extent of the debt. Adair took the title subject only to the rights of the Olds Wagon Works and such other creditors as might see proper to attack the conveyance. Miller v. Koertge, 70 Tex. 163, 7 S. W. 691 [8 Am. St. Rep. 587]. But the defendant, Adair, admitting the purchase of the goods by him from Stephens, and the conveyance of the sheep to Stephens in consideration therefor, pleaded in defense of plaintiff's action for the sheep the invalidity of his title, alleging, in effect, that it had failed for the reason that the conveyance was one made to defraud creditors, and therefore liable to be avoided by them, and had, in fact, been attacked by a creditor. There is an implied warranty of the title to personal property when it is sold by one who is in possession thereof. The failure of consideration in this case would arise only from the failure of title. There was no failure of title. After the goods had been attached, Stephens paid the debt and discharged the lien, which invested Adair with a perfect title. It must also be considered that Adair bought the goods with full notice not only of Stephens' indebtedness, but of the fact that Richardson, the agent of the Olds Wagon Works, was present, and pressing Stephens for a settlement. He bought with full notice of whatever invalidity there was in the title, and cannot set up the defense of failure of consideration, when in fact the title had never failed. We are of the opinion that the charge of the court in this respect was error."

We have diligently sought to see if it could be ascertained from the record that there was such fraud in the inception of this transaction as would prevent a trust arising in favor of the land company, and we are not unmindful of the case of Robb v. Robb, 41 S. W. 92, holding that no trust can be ingrafted upon a conveyance where by the statement of the vendor it was made to hinder and delay his creditors, and, as heretofore held by this court, in the case of Houston Oil Company v. Votaw, 184 S. W. 662:

" 'If a voluntary conveyance is made for some illegal or fraudulent purpose, whether it is common law or a modern conveyance, no trust will result to the grantor, for the reason that the rules of law cannot be used, controlled, or avoided by parties with the fraudulent intent to do that indirectly which they cannot do directly.' 1 Perry on Trusts (6th Ed.) § 165, p. 257."

And further:

"It is a well-settled principle of equity jurisprudence that in general, when one person pays the purchase money for land, and the title is conveyed to another, a trust results in favor of the party who paid for the land, but, where said purchase is made in fraud of an existing statute, and in evasion of its express provisions, no trust can result in favor of the party * * * guilty of the fraud." Miller v. Davis, 50 Mo. 573.

In the case of Patty-Joiner Co. v. City Bank, 15 Tex. Civ. App. 475, 41 S. W. 173, in which the Supreme Court denied a writ of error, the court said:

"The distinction between enforcing illegal contracts, or contracts void as against public policy, and asserting title to property or money which has arisen from them, is clearly and distinctly drawn. [The cases of Armstrong v. Bank, 133 U. S. 469, 10 Sup. Ct. 450, 33 L. Ed. 747, and Planters' Bank v. Union Bank, 16 Wall. 500, 21 L. Ed. 473, are cited by the court.] In the case of Planters' Bank v. Union Bank, above, the court said: 'The plaintiffs do not require the aid of any illegal transaction to establish their case. It is enough that the defendants have in hand a thing of value that belongs to them. Some of the authorities show that, though an illegal contract will not be executed, yet when it has been executed by the parties themselves, and the illegal object of it has been accomplished, the money or thing which was the price of it may be a legal consideration between the parties for a promise, express or implied, and the court will not unravel the transaction to discover its origin.' "

This doctrine, it seems, is the law in Texas. In the case of De Leon v. Travino, 49 Tex.

92, 30 Am. Rep. 101, the court, Judge Moore handing down the opinion, says:

"But, if a contract is illegal, certainly it does not follow that it is illegal or immoral for the parties, after its completion, to fairly settle and adjust the profits and losses which have resulted from it. The vice in the contract does not enter into the settlement so that all contracts and undertakings based upon, or growing out of, the settlement, confer no rights which the courts will respect or enforce. By her answer appellant sought to be relieved against an executed contract, upon the ground that her intestate had been engaged with appellees in an illegal enterprise, * * * instead of in settlement of it, the taint of the contract would have attached to the notes, and appellees could not maintain an action upon them. But the answer merely shows that, by reason of the illegal character of the enterprise in which the parties had been engaged, appellant's intestate could not have been forced to an accounting with appellees, or to pay or give his notes for the amount found to be due from him to appellees on such accounting. This, however, is no reason why an action may not be maintained on notes given for the amount found to be due on a voluntary settlement of the illegal partnership enterprise."

[3] The above on the theory that appellee could not have been defeated by illegality in the contract by which the land was obtained by V. Wiess, because the courts, while they will not carry out an invalid contract, will decree a recovery of the subject-matter thereof, when the invalid contract does not have to be set up, in order to state the plaintiff's cause of action. We have set out the testimony of the two Messrs. Greer and the other testimony showing that the McFaddin-Wiess-Kyle Land Company had paid for the land, and that the title was taken for the benefit of said company, which facts alone, in our judgment, warrant a recovery.

The case of Eastham v. Roundtree, 56 Tex. 110, quoted in appellant's brief, we believe, announces a correct legal proposition, wherein it is said:

"If one-half of the purchase money was paid by the father under such circumstances as made such investment for the benefit of the intervener fraudulent as to his creditors, then it is certainly true that all the claim she has is based upon a transaction illegal because made to hinder, delay, and defraud creditors, and from which no resulting trust can spring in her favor, although she may not have participated in the fraud and may not have had any knowledge thereof; for in such case she appears as the intended donee of her father, through a transaction forbidden by law. To permit a man's children to recover property which he had fraudulently placed in the name of another for the purpose of placing it beyond the reach of his creditors, upon the ground that it was intended for their benefit, would be to contravene a well-settled public policy, and to offer a premium to dishonesty. It is a universal rule that no one can claim a right through the fraud of himself or another. * * * No resulting trust can spring from an act contrary to public policy or a statute."

Again, we say that we believe that it announces a correct rule, but in the case before us we are at a loss to know upon what testimony a theory could be based to show that this original trust, wherein the property was conveyed to V. Wiess, and the consideration entirely paid by the McFaddin-Wiess-Kyle Land Company, could be in any way held to be a conveyance to defraud creditors, and we again say that, if appellant had any rights enforceable, and which were judicially determined, any execution against the McFaddin-Wiess-Kyle Land Company could have been instantly satisfied, and there neither is nor could have been, in the transaction referred to, and surrounding this conveyance to V. Wiess for the benefit of the land company, any expectation or hope that any bona fide creditors could be defeated of their rights. In our view there is no merit in this assignment, and we believe that the action of the lower court is correct, and therefore the assignment is overruled.

By the second assignment of error the claim is made that the court erred in the second paragraph of its charge, which is a peremptory instruction to the jury to find for the plaintiff for an undivided half of all the land sued for by plaintiff, less that tract of 238.52 acres which was conveyed by Jef Chaison and J. M. Hebert to W. P. H. McFaddin February 7, 1885, and also less that portion of said Cunningham survey occupied or used by and included in the right of way of the Texas & New Orleans Railroad Company, because, if the evidence was sufficient to warrant the court in holding as a matter of law that V. Wiess held said one-half interest in trust for said McFaddin-Wiess-Kyle Land Company, as claimed by plaintiff, still the evidence also showed that said V. Wiess never at any time during his lifetime, nor his surviving widow and heirs after his death, conveyed the title to said land, either legal or equitable, to the said McFaddin-Wiess-Kyle Land Company, or the plaintiff in this suit, prior to the date of the judgment which was recovered by the defendant in this suit against the surviving widow and heirs of V. Wiess. The proposition submitted under this assignment is:

"That plaintiff introduced in evidence a deed signed by the widow and children of V. Wiess to W. P. H. McFaddin, P. H. Wiess (successor of V. Wiess on the board of trustees of McFaddin-Wiess-Kyle Land Company), and W. W. Kyle, constituting the present three trustees of the McFaddin-Wiess-Kyle Land Company, dated December 18, 1913, purporting to convey an undivided one-half interest in the Cunningham survey, less the McFaddin 208 acres. But, since there was no evidence of the acceptance of said deed by the McFaddin-Wiess-Kyle Land Company, and the evidence without controversy showed that P. H. Wiess was not a trustee of the McFaddin-Wiess-Kyle Land Company and that it was the intention of the grantors in the deed (P. H. Wiess being one of them) in making the deed to P. H. Wiess, as one of the three trustees of the McFaddin-Wiess-Kyle Land Company, to procure by the delivery of the deed to McFaddin-Wiess-Kyle Land Company an acknowledgment by the act of accepting the deed on the part of the other two trustees, W. P. H. McFaddin and W. W. Kyle, that P. H. Wiess was a trustee of the McFaddin-Wiess-Kyle Land Company, as named in the deed, and since the evidence showed that the deed was never accepted and P. H. Wiess thereby acknowledged by the

other two trustees to be a trustee, as named in the deed, there was no delivery and acceptance of the deed to make the same effective as a conveyance of the title."

Upon this branch of the case—that is, delivery of the deed—we have to say that there is no question that the deed was executed by the widow and heirs of V. Wiess, and duly acknowledged by them for the express purpose of passing the title, and vesting the same in the named trustees, in trust for the land company, and that the deed was executed in recognition of the trust which had long theretofore existed, and it was executed in discharge of an obligation fully recognized by V. Wiess in his lifetime, and that the heirs in fact executed a deed which decedent desired to execute in his lifetime, and would have executed had his life been prolonged, and was a conveyance of property which both the records of the land company and V. Wiess fully established to be the property of said company. The deed was executed on December 18, 1913. Appellant's suit against the Wiess heirs, and default judgment took place in October of the following year.

It is contended that a deed from the Wiess heirs to the three named trustees, in trust for McFaddin-Wiess-Kyle Land Company, in discharge of an existing obligation, or for any other purpose, vested the title in said land company, and constituted the named parties trustees of this particular land, whether trustees for other properties of the land company or not; and, second, that in this case there is no evidence that any trustee refused to act, but, on the contrary, it is undisputed that the trust was accepted by two of the trustees, at least, and there is no evidence of the nonaction of the third; and, third, that the delivery of the deed from the Wiess heirs to P. H. Wiess, one of the trustees named therein, of itself constitutes a valid delivery, which completely divested the title out of the Wiess heirs, and vested it in trust for the McFaddin-Wiess-Kyle Land Company; fourth, that in any event the delivery of the deed passed the title from the day of its delivery, and constituted a valid conveyance from said date; and, fifth, that equity would not, in any event, permit the trust to lapse or be defeated by the nonaction of the trustees or nonacceptance by one or all of the trustees, and that the title in question would pass in any event into the beneficiaries, and equity would name additional trustees if all of those in the deed had refused to act, and it was not in the power of any or all of the trustees to defeat the trust by a refusal to accept the deed.

We believe that each one of the above five contentions presents a sound legal proposition. The circumstances of the transfer itself are as follows:

George C. O'Brien testified as follows:

"I am an attorney practicing in Beaumont. For the last year or two I have been representing the V. Wiess estate as attorney. I suppose you might say that I still represent them. I represent two of the heirs in some litigation here, not in a general way, but I represent two of the heirs in certain litigation. I think my contract with the estate had terminated at the time the receiver was appointed, that is, my original contract, though I did represent them in a general way. My contract with them had expired, that is, with the estate, but I think I represented them all in a general way. Prior to the appointment of the receiver for the land company I thought that P. H. Wiess had been made a trustee of the McFaddin-Wiess-Kyle Land Company. The Court of Civil Appeals said he hadn't been, but I thought he had been constituted a trustee. He had never been issued any certificate by the other two trustees; no, sir; he was never qualified, that is, according to the decision of that court.

"With regard to the deed that has been introduced in evidence made by Laura E. Wiess, surviving widow of V. Wiess deceased, P. H. Wiess, Mrs. Hal H. Branham, and her husband, Hal H. Branham, to W. P. H. McFaddin, P. H. Wiess, and W. W. Kyle, conveying a one-half interest in the D. A. Cunningham survey, less 208 acres conveyed by Chaison & Hebert to W. P. H. McFaddin, and a small right of way to the East Texas Railroad Company, dated December 18, 1913, that deed never was delivered to the McFaddin-Wiess-Kyle Land Company. It was tendered to Mr. McFaddin, but it was delivered finally to the receiver, Mr. Thos. H. Langham. As to when it was delivered, well, by referring to a receipt that I have on my desk I could tell you exactly the date. I didn't know I was going to be down here. It was since the appointment of the receiver in February of this year.

"As to why it was that it was not accepted by Mr. McFaddin when tendered to him, well, Mr. McFaddin didn't take it. I called it to his attention two or three times, lying on my desk there, and I told him there was the deed, but he never did take it, but when Mr. Langham was appointed receiver, and this suit was instituted, Mr. Langham came up there, and I think I gave it to him; that is my recollection; and he wanted it for Mr. Sonfield, I think, his attorney. When you ask me if the deed was to be delivered upon Mr. Percy Wiess being made a trustee of the McFaddin-Wiess-Kyle Land Company, no, sir. Mr. Percy Wiess was elected trustee on November 13, 1913, I think it was, and, so far as he was concerned and his attorney (myself), we considered he was a trustee for a month or more after that, but in order to make him a trustee he had to have a certificate of election signed by the other two trustees, and so it went on 30 or 60 days, I don't know how long it was, but in the meantime I got this deed, thinking that Mr. Percy Wiess was a trustee with Mr. Kyle and Mr. McFaddin, but at the end of the 60 days, or whatever time it was, Mr. McFaddin declined to sign this certificate of Mr. Percy Wiess' election, and repudiated it, and of course in the meantime I had got this deed made to the three trustees on my desk, and I called his attention to that—that is, the deed. I sent it out and got them all to sign it, and it came back, and it laid there on my desk until Mr. Langham wanted it. As to whether he refused to accept it, he didn't say anything about it. When I told him there was the deed, he would just talk on about other things, and never would take it. He never signed the certificate, and we mandamused him, and went to the Court of Civil Appeals, and they reversed it, so that ended Percy as a trustee.

"There is a condition in the by-laws of the McFaddin-Wiess-Kyle Land Company that a certificate has to be issued by the two trustees; that that has to be recorded in the records of Jefferson county. This deed has in it the recital and statement that he has been elected trustee, and at the time I drew the deed I was of

that impression, but his certificate never had been issued, and had never been recorded in Jefferson county. I don't know that it was the desire of the Wiesses to have this deed recorded so that that would be recorded as a fact. I put the name there. I wanted to ratify that election myself, but I don't know that my clients knew anything about it. Of course, I didn't consider that V. Wiess owned the land, so I just wrote the deed that way, and if I am allowed to state it, I just wanted to recognize, well, I really wanted to deliver the land to them, but in doing so I wanted to recognize Mr. Wiess as a trustee, too, because I considered him at the time I drew the deed as a trustee. He never was recognized as a trustee only in little things like that. They declared a dividend out there, I believe, and things of that kind, but, according to the Court of Civil Appeals, he wasn't recognized. He wasn't issued a certificate. There was a certificate issued, and Mr. Kyle signed it, but Mr. McFaddin wouldn't.

"I prepared that deed. It is a fact that at the time of the preparation of that deed, and prior to that time, the heirs of V. Wiess claimed no interest in this property, except in so far as they were interested in the land company. That is all. They recognized this property as the property of the land company at all times. I prepared the deed by which they were to convey the legal title into the land company for the purpose of vesting the legal title where the equitable title already stood and discharging the trust which V. Wiess had assumed. At that time I understood Mr. Percy Wiess, W. P. H. McFaddin, and W. W. Kyle were trustees, and, naming them as trustees, these heirs made the conveyance. I was the attorney of Mr. Percy Wiess, who was one of the trustees named in that deed. He didn't repudiate the trust or refuse to take the land in trust for the company. He accepted the trusteeship, but just left this deed matter to me. He accepted the trusteeship as named in that deed, which the heirs invested in him by the deed. He could have got possession of the deed when it came in there, and it was subject to his control, if he wanted it. When Mr. McFaddin came in there the deed was lying on the desk, and I told him the deed was there, and he was free to take it away, and do whatever he wanted with it; yes, sir. I tendered it to him as president and general manager of the company. It was up to him whether he left it on my desk or took it out and put it in the files. That deed lay on my desk for nearly a year. Yes, sir; I surrendered my control of it and put it at his disposal and at the disposal of Mr. Percy Wiess, who was one of the grantees, and at the disposal of Mr. Kyle. It was there for any of them that wanted it. As a matter of fact the heirs had parted with all their interest in the property, and the deed was tendered to these people and put under their control for the purpose of divesting the title from the heirs and doing what the deed purported to do.

"As to whether it is true that Mr. Charlie Chaison knew of the existence of the deed, and knew that the heirs had conveyed the property before he filed the suit down here, well, my recollection is that I told Mr. Chaison about having fixed the deed, and that Mr. McFaddin would not accept it. My recollection is that we had had a good deal of talk. Mr. McFaddin would come in and talk about the matter, and Mr. Chaison would talk to me on different things, and my recollection is that I laughingly told Mr. Chaison that I had made out the deed there, and had Percy in there as trustee, and McFaddin wouldn't accept the deed, but the deed was there, or something like that. The deed had been surrendered as far as the heirs were concerned; yes, sir; it was lying on my desk there. Mr. Wesley Kyle didn't refuse to accept it. We were all so busy litigating over those things we didn't think much about the deed. We had other troubles.

"As far as the heirs were concerned, they had executed that deed, and I had put it at the disposal of the trustees. Mr. McFaddin told me when I first came down here that was the company's land; and Mr. Wiess and they never claimed it, and none of his heirs ever claimed it that I know of; all they said, they just washed their hands of it. Mr. Wiess—that is, it didn't belong to him, and the books showed they had got the money for it. As to how long after the execution of that deed it was placed at the disposal of the trustees of the land company, or they were given to understand that the deed was executed and at their disposal, well, I suppose Mr. Percy Wiess knew it within three or four days, and possibly within ten days Mr. McFaddin knew of it; I think that would fully cover the time. I would judge that by the 1st or 2d of January all of those trustees were notified that the deed was executed and at their disposal. I wanted to get the matter closed and to let them know right away. They came into my office and talked over it at different times.

"Mr. Wiess stated that they didn't claim the land—that it belonged to the land company. That related entirely to this Hyde interest; yes, sir; just what is in the deed there. That is all they claimed. The company never claimed any of those lands except this one-half of the Hyde interest and the 208 acres; that is the way I understood it from talking with Mr. McFaddin. I knew they were trying to divide it, and I tried to bring about peace between him and Mr. Chaison, and get an amicable division of it, and I couldn't get them together, and I dropped it. Mr. McFaddin said that the Hyde interest belonged to the land company, and didn't belong to Mr. Wiess. I knew that the deed was in Mr. V. Wiess' name, and had been made to him. Mr. McFaddin told me why it was that they put this land in Mr. V. Wiess' name. He was up there talking, before the deed was made, when I first came down here, and suggested that he wanted to get this land transferred over to the company, and explained why they put it in Mr. Wiess' name, but I only remember in a general way what he said about it. It has been a long time ago.

"Well, as I remember and understand about the matter, Mr. Chaison had been there a few days before that and had told me about the matter, and a day or two after that Mr. McFaddin was in the office talking to Mr. Wiess and me, that is, was talking to me, and Mr. Wiess was present, and he said he wanted this land transferred, and it was necessary to take the land in the name of V. Wiess, and that that was done to avoid a plea for rents, or something like that. Now, it has been so long ago, and I haven't reviewed the papers, but it seems that some one, in order that Mr. Wiess should be an innocent purchaser, and they couldn't plead the offset of these rents, that the land company had cultivated these lands, or something of that kind. That is the way I understood it. And I listened to him, and after he was gone I laughingly said, and referred to what Mr. Chaison said, and said Mr. Mac and Charlie were pretty close together about it. But as to how it was I didn't understand, unless it seems that the land company had cultivated the land, or something of the kind, and hadn't paid the rents, or put improvements on it, and they wanted to hold them, having bought the land, so that they would put it in the name of Mr. Wiess. Rents or improvements, or something of that kind, he said that was the reason of putting it in the name of Mr. Wiess.

"In my conversation with Mr. McFaddin I understood it was with reference to the land that is described in that deed. As to whether it is a fact that there wasn't any discussion about anything else except the interest that

Wiess held, well, we had several discussions about it, because he and Charlie were trying to divide it, and I was talking to them both. He never claimed the other half interest. Of course, he didn't come right out and say, 'I don't own the other half interest,' but he recognized that half of the land was Mr. Chaison's. They had a compromise on and tried to divide it; I tried to divide it as a friend to both of them. I talked to Mr. Chaison and then to Mr. McFaddin. Mr. Chaison recognized an interest in McFaddin and the McFaddin-Wiess-Kyle Land Company; I think it was a half. He recognized a half interest, and they recognized a half interest, before the controversy came up about ownership. Of course, Charlie was complaining all the time that it was his land or that he had lost it, or something of the kind, but I didn't pay much attention to that. But that is the way the squabble came up; they wanted to divide, and Charlie made what I considered a very fair proposition, but he wanted to buy some of the land and leave it to disinterested parties outside, to state the value, in order to give him an outlet to the railroad, and Mr. McFaddin said 'No,' he wouldn't sell any of his lands, and I told Charlie then I would drop the whole thing. And it was after that that he brought the deed down there; I mean Mr. McFaddin sent a deed down there to be signed by the heirs, but I drew it over again, because I didn't think it properly described the land.

"For the purpose of partition Charlie Chaison recognized the right of the land company in a half interest, but I couldn't say it was a conclusion about recognizing. I can tell you what he said. Of course, Mr. Chaison was complaining about his and McFaddin's former litigation over this tract of land, but then he didn't seem disposed, at that time he wasn't talking anything about claiming this half, but it seems there had been some former litigation, and he claims that by reason of Mr. Mac's testimony he hadn't got his rights in the matter, but he wanted to divide the two halves. So I tried to divide, and after I couldn't divide it I think Mr. Chaison instituted this suit or some other suit, possibly another one, but I thought I would obviate this litigation if I could get them to divide, and end this trouble between them.

"Mr. McFaddin recognized the other half interest was in Mr. Chaison. He said something of the kind about having put improvements on the land, and that the company had cultivated it in rice, and that in order to keep the company from being held liable for rents and profits they were putting this land in the name of V. Wiess to hold as a trustee for the company; something of that kind. I know I remarked that they both agreed pretty much in their terms of the matter, and laughed and talked to Mr. Wiess about the matter, but then prior to that time they had both recognized a half interest respectively, because they both wanted to divide it. As to whether I got the idea that the Hyde half interest was put in the name of V. Wiess, and not in the name of the land company, for the purpose of concealing the real owner and the liability of the land company from the man who might have the claim for the rents and improvements, well, just as I said a while ago, the word 'concealing' wasn't used, but he talked about it and said it was necessary to put that in V. Wiess' name, in order to obviate this plea, whatever it was, claim for rents and participation in the improvements, something of that kind. That is the way I understood it, but I couldn't recall the words used or undertake to repeat them. That is the impression I got. I believe you are right in stating that at the time this suggestion of partition was made, Mr. Chaison was claiming that the land was in V. Wiess, and that it was afterwards that McFaddin claimed that the land was in the land company. Mr. Chaison at first asked me positively who that land belonged to, and I told him—well, I wouldn't tell him anything at first. When I was trying to settle between him and McFaddin I wouldn't give him any information. He wanted to know something about what was on the books, and I evaded it, and after I failed to get them to agree, I think subsequently he asked me who paid that money, and I think I told him; it was after the grand jury had it here, or they wanted the books. When Mr. Chaison first spoke to me about it he put the question to me straight to tell him who that land belonged to. He said he didn't want to give Mr. Wiess any trouble, because he didn't think Mr. Wiess had had anything to do with it, or something like that, and I evaded it for a time, trying to settle it. Now as to what his impression was I don't know, but I led him to believe, that is, I wouldn't tell him out— He said the records said it belonged to V. Wiess, and if it did he didn't want to give Mrs. Wiess any trouble about it, and I let him think that for a time, until possibly the grand jury took charge of it, or something of the kind, but at any rate Chaison saw the books or got the information from the books, but I didn't give it to him, because I didn't feel that I was authorized. My recollection is that I refused to tell him positively that it was the land company's land, and avoided it as long as I could. He knew it at the time of the filing of this suit against the heirs. I had already filed an answer in that suit he filed. I endeavored to set up the facts in that and leave the court to draw the conclusion. I wouldn't say what it was, but I endeavored to set forth the facts, and let the court draw his conclusion about it."

The deed conveys all the title of the Wiess heirs into W. P. H. McFaddin, P. H. Wiess, and W. W. Kyle in trust for the land company. We have found no evidence in this case that any trustee refused to accept the trust or act in said capacity. O'Brien testified that Wesley Kyle did not refuse to accept it, and further testified that P. H. Wiess accepted it, and says that McFaddin could have gotten possession of it when it came in there, and it was subject to his control, if he wanted it; when McFaddin came in where the deed was lying on the desk, and he told him it was there, and he was free to take it away and do whatever he wanted with it; he tendered it to him, as president and general manager of the company, and it was up to him whether he left it on his (O'Brien's) desk or took it out and put it in the files; that that deed lay on his desk for nearly a year.

[4] We hold that the title passed out of the Wiess heirs by the deed, and that if, as counsel says, the deed had been from the Wiess heirs to Woodrow Wilson, Theodore Roosevelt, and W. H. Taft, in trust for the McFaddin-Wiess-Kyle Land Company, the title would have passed out of the grantors, and vested in the beneficial interest in the company.

In the case of Smith v. Adams, 4 Tex. Civ. App. 5, 23 S. W. 50, it is said:

"While the deed of partition between Towns, Harris, and Pease was neither witnessed nor acknowledged by the parties thereto, still it was an acknowledgment that Towns held the lands in trust for himself and Harris and Pease, and was a good partition thereof. It vested an equitable title in the several parties for their respective interests, sufficient to support the plaintiff's cause of action; and, although it was found among the papers of Towns' estate, there

could be no presumption against the delivery of the instrument, because Towns was entitled to the possession thereof as much as either Harris or Pease."

The conveyance was acknowledged by P. H. Wiess and the other heirs of V. Wiess, was accepted by P. H. Wiess, and a delivery of the deed to George C. O'Brien was also, we hold, a valid delivery, and passed the title from and after the date of said delivery.

The case of Walker v. Erwin, 47 Tex. Civ. App. 637, 106 S. W. 164, and the case of Stephan v. Bank, 69 Tex. 518, 6 S. W. 823, and the cases of Elliott v. Morris, 43 Tex. Civ. App. 482, 98 S. W. 220, Bunnell v. Bunnell, 111 Ky. 566, 64 S. W. 424, 65 S. W. 607, and Gould v. Day, 94 U. S. 405, 24 L. Ed. 232, are cases in point here.

[5] However, we do not believe that a court of equity will permit a trust to lapse or defeat the right of the beneficiary by the nonacceptance or nondelivery to one or more of the trustees named, but, on the contrary, if necessary, will name trustees, and charge them with the duty of executing the trust. We hold that the acceptance by the trustee has nothing to do with delivery, and its nonacceptance will not defeat it. Wallis v. Beauchamp, 15 Tex. 307; Walker v. Johnson, 37 Tex. 127; Pomeroy on Equity, par. 1007; Snell on Equity, 138; Washburn on Real Property, par. 1476; Stone v. King, 7 R. I. 358, 84 Am. Dec. 557; Minot v. Tilton, 64 N. H. 371, 10 Atl. 682; Roche v. George, 93 Ky. 609, 20 S. W. 1039.

Under any phase of the matter, we cannot see how the action of the court was error, and believe the same was fully warranted, and therefore this assignment is in all things overruled.

The third and fourth assignments of error are as follows, and will be considered together:

The third assignment is:

"The court erred in the second paragraph of its charge, which is a peremptory instruction to the jury to find in favor of plaintiff for an undivided one-half of all the land sued for by plaintiff, less that tract of 238.52 acres which was conveyed by Jef Chaison and J. M. Hebert to W. P. H. McFaddin, February 7, 1885, and also less that portion of said Cunningham survey occupied or used by and included in the right of way of the Texas & New Orleans Railroad Company, because, in order to entitle the plaintiff to recover such one-half undivided interest of the land in controversy, it was incumbent upon the plaintiff to show a title thereto, either legal or equitable, superior to the title of defendant thereto, and plaintiff failed to show such title."

The fourth assignment is:

"The court erred in the second paragraph of its charge, which is a peremptory instruction to the jury to find in favor of plaintiff for an undivided one-half of all the land sued for by plaintiff, less that tract of 238.52 acres which was conveyed by Jef Chaison and J. M. Hebert to W. P. H. McFaddin February 7, 1885, and also less that portion of said Cunningham survey occupied or used by and included in the right of way of the Texas & New Orleans Rail-

road Company, because it is agreed by the parties herein that the legal title to one-half the land in controversy, herein, save and except the Texas & New Orleans Railroad Company right of way, and the 238.52-acre tract above referred to, was in the Hyde heirs, named in said agreement at the date of their conveyance to V. Wiess, and it was shown by the evidence that defendant in this case, subsequent to the death of V. Wiess, recovered a judgment against the surviving widow and heirs of said V. Wiess, which placed the title to said land in the defendant herein, and that defendant has never parted with the title thereto to the plaintiff herein or any one else."

The proposition under these two assignments is as follows:

"Since the evidence showed without controversy that the Hyde one-half interest in the land was conveyed to V. Wiess, and the Texas Rice Land Company procured a judgment for the title and possession of the land against the widow and heirs of V. Wiess, and since there is no evidence in law ingrafting upon the deed in the name of V. Wiess a trust in the land for the benefit of the McFaddin-Wiess-Kyle Land Company, and there being no evidence that the deed signed by the widow and heirs of V. Wiess was ever accepted by the McFaddin-Wiess-Kyle Land Company, the case should be reversed, and judgment here rendered in favor of appellant."

[6, 7] We have held, and now hold, that the overwhelming evidence was sufficient to ingraft a trust in favor of V. Wiess for the benefit of the McFaddin-Wiess-Kyle Land Company, and we have also held, and hold now, that in any event the deed signed by the widow and heirs of V. Wiess conveyed the legal title to the McFaddin-Wiess-Kyle Land Company, and there is no question from this record that long before the judgment by default obtained by appellant against the heirs of V. Wiess the appellant knew both that the said V. Wiess originally acquired the land, and was holding it in trust for the McFaddin-Wiess-Kyle Land Company, and also that the said McFaddin-Wiess-Kyle Land Company had paid the purchase money for the same, and appellant knew that the said V. Wiess during his lifetime recognized the trust, and knew that after his death the heirs of said V. Wiess conveyed the legal title of the land to the said McFaddin-Wiess-Kyle Land Company, and that at the time of the taking of said default judgment by appellant against the heirs of V. Wiess appellant knew and had been informed of all of the facts above stated, and knew that in fact and in truth the heirs of V. Wiess had no right, title, interest, or claim to the land in controversy. Therefore, they not having any claim to or interest in the land, the judgment by default did not put any title in appellant.

The fifth assignment is based upon alleged error in the lower court refusing the motion of defendant to submit the case to the jury upon special issues. We do not think there was any issue in the case to submit for the jury's consideration, but believe that the action of the court in refusing so to do was

correct. Therefore this assignment is overruled.

The sixth assignment is as follows:

"The court erred in refusing to submit to the jury on request of the defendant special issue No. 2, in substance and effect as follows: 'If you answer "Yes" to question No. 1, next above, then you will answer the following question: "Was it the understanding and purpose on the part of the said V. Wiess and the said W. P. H. McFaddin, at the time said deed was taken in the name of the said V. Wiess individually, that it should be done for the purpose of hindering, delaying, preventing, and defeating the American Oil & Refining Company, defendant's predecessor in title, in the prosecution, collection, and recovery of the rental value on that one-half undivided interest of said land then owned and claimed by said American Oil & Refining Company?" Answer this question "Yes" or "No." '"

The view we take of this case is there was no evidence of fraud on the part of McFaddin or Wiess or the Greers in taking the title in the name of V. Wiess, and taking the title in such manner was legitimate. We have heretofore set out in its entirety the testimony of the two Greers, and also we have set out the testimony of the witness O'Brien, the only parties who knew or pretended to know why the title was taken in the name of V. Wiess. Appellant and its predecessors in title have never owned the land. The testimony of the facts speak for themselves; the acts of the parties negative the fact of any attempted secretion of property for the purpose of defrauding creditors of the McFaddin-Wiess-Kyle Land Company. If, however, the original trust had been fraudulent, even in that view of the matter appellee had a valid acknowledgment of trust from the Wiess heirs, and a deed from them prior to appellant's judgment by default, and, in addition to that fact, in our opinion, had perfected its title under the ten-year statute of limitation. Finding no merit in the assignment, it is overruled.

The seventh assignment challenges the action of the court in its charge to the jury, wherein the jury was instructed to bring in a verdict for the plaintiff for an undivided half of the land in controversy, except the tract of 243 acres and a small portion constituting the right of way of the Texas & New Orleans Railroad Company, because, if the evidence showed that the conveyance was made by the Hyde heirs to V. Wiess in trust for the benefit of the McFaddin-Wiess-Kyle Land Company, the evidence also showed that the legal title to said land was taken by V. Wiess, and it was agreed between said V. Wiess and W. P. H. McFaddin, president and manager of the said McFaddin-Wiess-Kyle Land Company, acting for said company, that said title was to be taken for the purpose of hindering, delaying, preventing, defrauding, and to defeat defendant and its predecessors in title in the collection of the rental value of one-half of the rent then owing by the McFaddin-Wiess-Kyle Land Company to defendant and its predecessors in title, and the plaintiff could not recover unless the heirs of V. Wiess had conveyed the legal title to said land to the McFaddin-Wiess-Kyle Land Company prior to the judgment obtained against the heirs of V. Wiess on the 6th day of October, 1914, and although the plaintiff introduced a deed in evidence from the heirs of V. Wiess dated December 18, 1913, purporting to convey to W. P. H. McFaddin, W. W. Kyle, and P. H. Wiess, as trustees for said McFaddin-Wiess-Kyle Land Company, the said one-half interest of the land in controversy, but there was no evidence of the delivery of said deed and its acceptance by the McFaddin-Wiess-Kyle Land Company through the trustees named in said deed. In any event, or at least the evidence introduced on the trial raised an issue of fact as to whether said deed was delivered and accepted prior to the date that the Texas Rice Land Company recovered judgment against the heirs of V. Wiess, and the court therefore erred in not submitting said issue of the delivery and acceptance of said deed to the jury.

We have set forth our view in quite a lengthy way heretofore in this opinion, and deem it entirely unnecessary to go over the same ground again. In our judgment the deed from the heirs of V. Wiess conveying the legal title, is not shown to have been rejected, but we believe that if the same had not been delivered, or if they had refused to accept the same, nevertheless, equity would have enforced the trust, and, if necessary, new trustees would have been designated. The assignment is overruled.

The eighth assignment of error assails the action of the court in refusing to submit to the jury, at the request of defendant, special issue No. 3, stating that it was an issue of fact to be determined by the jury whether or not the deed was delivered and accepted by said grantee, McFaddin-Wiess-Kyle Rice Land Company, as named in the deed, and whether in fact said deed was ever delivered and accepted, taking in consideration all the facts and circumstances in evidence bearing on the issue. This assignment is practically to the same effect as the seventh assignment.

The ninth assignment of error is based on the fact that the court refused to permit defendant to introduce in evidence, and in sustaining plaintiff's objection to interrogatory No. 13, and the answer thereto in the deposition of W. P. H. McFaddin, duly signed and sworn to by McFaddin in the case of Texas Rice Land Company et al. v. W. P. H. McFaddin et al. (No. 10800) in the district court of Jefferson county, Tex., on the 11th day of February, 1915, before W. H. Burgess, notary public of Jefferson county, Tex., the officer taking the deposition, said interrogatory and answer being as follows:

"Int. 13. Subsequently to the time the aforesaid mentioned deed to said V. Wiess was delivered to and accepted by him from said Kather-

ine B. and Lawrence Hyde was there or not any written agreement or understanding between said V. Wiess, or any one purporting to act for him, and you, or said McFaddin-Wiess Canal and Irrigation Company, or said McFaddin-Wiess-Kyle Land Company, or any other person or persons, as far as you know, that he sold or would sell, or had conveyed or would convey, to, or hold in trust for the use or benefit of, any of said person or persons the land or interest acquired by him under such deed? If there was not, answer 'Nay.' If there was, state when, where, and between whom such agreement or other instrument was made, and particularly whether it was made before or after you testified in or about March, 1912, in the above-mentioned cause, entitled Clara Chaison et al. v. W. P. H. McFaddin et al., and where same now is, and attach a copy of the same, writing your name thereon for identification, if such is in your custody, possession or power, and, if it is not, or is lost, state the fact. Ans. There was no agreement in writing that I know of, but there was a verbal agreement between the time he bought the land and the time of the delivery of the deed. It was before 1912. As shown by defendant's bill of exception No. 3, for that said interrogatory and answer were material to show, or tends to show, that said land was not conveyed to V. Wiess in trust for the McFaddin-Wiess-Kyle Land Company, and also showed or tending to show that the said deed from the heirs of V. Wiess to W. P. H. McFaddin, P. H. Wiess, and W. W. Kyle, as trustees of the land company, dated 18th of December, 1913, had never been delivered and accepted by the McFaddin-Wiess-Kyle Land Company."

Objection was made that these depositions were not admissible, because this suit had been filed prior to the taking of said depositions, and by express terms of the statute such deposition was only admissible in suits thereafter filed. This suit was filed by Thomas H. Langham on February 9, 1915. Langham was appointed receiver January 22, 1915. The depositions in question were filed after this suit was filed. The depositions were taken on the 11th of February, 1915; plaintiff's objection being that it was taken during the pendency of this suit, without notice to plaintiff.

Article 3653, Vernon's Sayles' Texas Civil Statutes, provides as follows:

"When any person may anticipate the institution of a suit in which he may be interested, and may desire to perpetuate the testimony of a witness to be used in such suit, he, his agent or attorney, may file a written statement in the proper court of the county where such suit could be instituted, representing the facts and the names and residences, if known, of the persons supposed to be interested adversely to said person; a copy of which statement and writ shall be served on the persons interested adversely; or, where such person, his agent or attorney, shall at the time of filing such statement, make affidavit that the names and residences of the heirs, successors or legal representative of any deceased person are unknown to the affiant, or reside beyond the jurisdiction of the state, the clerk of the court or justice shall issue a like writ, which shall be served on such unknown or nonresident persons by publication in some newspaper, in the mode and manner designated by law for the service of original process upon nonresidents or unknown parties; after which the depositions of such witnesses may be taken and returned by the parties making the said statement in the form and under the rules prescribed for taking testimony by deposition; and such testimony may be used in any suit which may be thereafter instituted by or between any of the parties to the statement, or those claiming under them, in like manner as if such depositions had been taken after the institution of such suit or suits; and, when such suits have been instituted, all such depositions so taken and returned shall be subject to the like exceptions as other depositions."

[8] It seems to be the intention of the statute to limit the use of the depositions so taken to suits to be thereafter instituted, and depositions which are to be used in a pending suit should be taken in said suit, and it seems to us that by the provision of the above statute a deposition taken in another suit, after the institution of this suit, was not admissible in this case, and the language of the statute is that the testimony may only be used in any suit which may be thereafter instituted by or between the parties to the statement or those claiming under them. The present suit was instituted solely by the Texas Rice Land Company against W. P. H. McFaddin, W. W. Kyle, Laura E. Wiess, Percy H. Wiess, and Ruth Wiess Branham and her husband, Hal Branham, individually, and the plaintiffs in this case, nor the McFaddin-Wiess-Kyle Land Company, nor its trustees, in their representative capacities, being parties, under the express language of the statute, the same should not be admitted. Furthermore, the record shows that the Texas Rice Land Company was sole plaintiff in the suit to perpetuate the testimony, and that the only defendants were W. P. H. McFaddin, W. W. Kyle, Laura E. Wiess, Percy H. Wiess, and Ruth Wiess Branham, and her husband, Hal Branham. One of the articles of association of the McFaddin-Wiess-Kyle Land Company was that the stockholders in said association should have no title in the trust property, which is or may be vested in the trustees. Therefore W. P. H. McFaddin, W. W. Kyle, and the heirs of V. Wiess had personally no individual title to the property. In this connection it may be well also to state that it is not shown satisfactorily that even W. W. Kyle or W. P. H. McFaddin, individually, were served with process in the cause, and that McFaddin was at the time of the trial alive and in Jefferson county, and was not served with a subpœna to testify in the cause.

The tenth assignment complains of the action of the court in sustaining plaintiff's objection to the introduction of a part of the same testimony of W. P. H. McFaddin given in the trial of the case of Clara Chaison et al. v. W. P. H. McFaddin et al. A good part of the discussion in passing on the ninth assignment of error applies to this assignment.

It was held in the case of Ellis v. Le Bow, 30 Tex. Civ. App. 449, 71 S. W. 576, reading from the syllabus, that evidence taken in

one case is not admissible in another the defendants in which were not parties to the first action, though the witnesses were dead.

It was contended also that the evidence was not admissible because the testimony of McFaddin, testifying for himself in a suit brought against him in an individual capacity, will not be considered in disparagement of any title he held as trustee, or other fiduciary capacity, and this rule seems to be the rule laid down in Enc. of Evidence, vol. 1, p. 524.

We do not believe there was error in the court's action on this matter. The assignment is therefore overruled.

To sum up the matter, as has been tersely stated, the contentions of appellee are:

(1) That under the uncontroverted evidence it was the real purchaser, having paid the entire consideration for the purchase of the land in controversy from J. B. Hyde heirs, and that, as a matter of law, V. Wiess never had any real personal interest in the land in controversy, and that by his purchase and his agreement to take the title for McFaddin-Wiess-Kyle Land Company, and by reason of his relation to said company, he was an express resulting and constructive trustee, holding said land for McFaddin-Wiess-Kyle Land Company.

(2) That long prior to the time appellee attempted to acquire any interest in the property the heirs of said V. Wiess recognizing the trust had made a conveyance of the property for the benefit of McFaddin-Wiess-Kyle Land Company, the cestui que trust.

(3) Because under the undisputed evidence the widow and heirs of V. Wiess, prior to appellant's judgment against them, had made a valid declaration of trust admitting the title of the property to be in McFaddin-Wiess-Kyle Land Company.

(4) Because under the uncontroverted evidence the McFaddin-Wiess-Kyle Land Company and its predecessors in title had held peaceable and adverse possession, using and cultivating all the land in controversy from the year 1902 to the year 1914, by virtue of which it became the owner of the interest in controversy, as against the defendant and its predecessors in title.

(5) Because the said McFaddin-Wiess-Kyle Land Company showed a prior possession of the property in question, which would have entitled it to a recovery even in the absence of the other proof.

These contentions, in the main, are correct, and, all taken together, are cogent, to our mind, and leave no doubt that the trial court should have instructed the jury to bring in a verdict for the appellee. So believing, the action of the trial court is in all things affirmed.

It is so ordered.